# EXHIBIT E

MAPN

# U.S. District Court
## Western District of Missouri (Kansas City)
### CIVIL DOCKET FOR CASE #: 4:25-cv-00546-BP

Dunkin v. Bowtech, LLC et al
Assigned to: Chief District Judge Beth Phillips
Cause: 28:1337 Sherman-Clayton Act

Date Filed: 07/15/2025
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Gary T. Dunkin**

represented by **Ashlea Schwarz**
Paul LLP
600 Broadway Boulevard
Suite 600
Kansas City, MO 64105
816-984-8100
Email: ashlea@paulllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Bodenheimer**
Paul LLP
600 Broadway Boulevard
Suite 600
Kansas City, MO 64105
816-984-8100
Email: david@paulllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Duffield**
Paul LLP
600 Broadway Boulevard
Suite 600
Kansas City, MO 64105
816-984-8100
Email: megan@paulllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard M. Paul , III**
Paul LLP
600 Broadway Boulevard
Suite 600
Kansas City, MO 64105
816-984-8100

Email: Rick@PaulLLP.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bowtech, LLC**

**Defendant**

**Hoyt Archery, Inc.**

**Defendant**

**Mathews Archery, Inc.**

**Defendant**

**Precision Shooting Equipment, Inc.**

**Defendant**

**BPS Direct, LLC**
*d/b/a Bass Pro Shops*

**Defendant**

**Dicks Sporting Goods, Inc.**

**Defendant**

**Jays Sports, Inc.**
*d/b/a Jay's Sporting Goods*

**Defendant**

**Kinseys Outdoors, Inc.**

**Defendant**

**Lancaster Archery Supply, Inc.**

**Defendant**

**Rogers Sporting Goods Holdings, Inc.**

**Defendant**

**Archery Trade Association, Inc.**

**Defendant**

**TrackStreet, Inc.**

**Defendant**

**Neuintel LLC**
*d/b/a Pricespider Holdings LLC, f/k/a Oris Intelligence*

**Defendant**

**Cabela's LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/15/2025 | 1 | COMPLAINT against All Defendants filed by Richard M. Paul, III on behalf of Gary T. Dunkin. Filing fee $405, receipt number AMOWDC-9661973. Service due by 10/13/2025 unless otherwise directed by the court. (Attachments: # 1 Civil Cover Sheet)(Paul, Richard) (Entered: 07/15/2025) |
| 07/16/2025 | 2 | **NOTICE OF INCLUSION FOR MEDIATION AND ASSESSMENT PROGRAM (MAP). REVIEW NOTICE AND MAP GENERAL ORDER CAREFULLY FOR IMPORTANT CHANGES, DEADLINES AND REQUIREMENTS.** <br><br> Notice of MAP assignment to outside neutral category I. (Attachments: # 1 MAP General Order)(WAG) (Entered: 07/16/2025) |
| 07/21/2025 | | SUMMONS ISSUED as to Archery Trade Association, Inc., BPS Direct, LLC, Bowtech, LLC, Cabela's LLC, Dicks Sporting Goods, Inc., Hoyt Archery, Inc., Mathews Archery, Inc., Neuintel LLC, Precision Shooting Equipment, Inc., TrackStreet, Inc.. (GDW) (Entered: 07/21/2025) |

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

|  |  |
|---|---|
| GARY T. DUNKIN, | |
| *Plaintiff,* | |
| | Case No.: |
| v. | |
| BOWTECH, LLC; HOYT ARCHERY, INC.; MATHEWS ARCHERY, INC.; PRECISION SHOOTING EQUIPMENT, INC.; BPS DIRECT, LLC D/B/A BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; JAY'S SPORTING GOODS, INC D/B/A JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; ROGERS SPORTING GOODS HOLDINGS, INC.; ARCHERY TRADE ASSOCIATION, INC.; TRACKSTREET, INC.; AND NEUINTEL LLC, D/B/A PRICESPIDER HOLDINGS LLC F/K/A ORIS INTELLIGENCE, | **CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |
| *Defendants.* | |

TABLE OF CONTENTS

Nature of the Case ...............................................................................................................1

Parties ..................................................................................................................................4

    I.      Plaintiff ...................................................................................................................4

    II.     Defendant................................................................................................................4

           A.  Bowtech, LLC..............................................................................................4

           B.  Hoyt Archery, Inc.........................................................................................5

           C.  Mathews Archery, Inc. .................................................................................5

           D.  Precision Shooting Equipment, Inc. .............................................................6

           E.  BPS Direct, LLC d/b/a Bass Pro Shops .....................................................6

           F.  Cabela's LLC................................................................................................7

           G.  Dick's Sporting Goods, Inc. .........................................................................8

           H.  Jay's Sports, Inc. d/b/a Jay's Sporting Goods.............................................8

           I.   Kinsey's Outdoors, Inc. ...............................................................................9

           J.   Lancaster Archery Supply, Inc......................................................................9

           K.  Rogers Sporting Goods Holdings, Inc. .......................................................9

           L.  Archery Trade Association, Inc...................................................................10

           M. TrackStreet, Inc.........................................................................................10

           N.  Neuintel LLC, d/b/a Pricespider Holdings LLC,
                f/k/a Oris Intelligence .................................................................................11

Jurisdiction, Venue, And Commerce ................................................................................12

Factual Allegations ...........................................................................................................13

    I.      MAP, Generally......................................................................................................14

    II.     The ATA is the Central Hub for Archery Product Suppliers ............................16

           A.  ATA Board of Directors .............................................................................17

           B.  ATA Retail Counsel ....................................................................................18

           C.  ATA Trade Shows.......................................................................................19

i

       D.  ATA Connect ...................................................................................................20

III.    Defendants Agree to Artificially Inflate, Fix, Maintain, or
       Otherwise Stabilize Archery Product Prices.........................................................21

       A.  Defendants Implement Their Agreement with the Help
          of Bass Pro Shops and Cabela's.................................................................22

       B.  MAP Policies See Widespread Acceptance and Defendants
          Encourage Continued Enforcement .................................................................28

       C.  Defendants Continue to Urge MAP Enforcement as
          the Conspiracy Continues Through the Present ...........................................41

IV.    Defendants Successfully Inflated Archery Product Prices
       to Supracompetitive Levels .....................................................................................49

V.    Defendants' Suppression of Competition through
       Their Exchange of Key Information .......................................................................51

Statute of Limitations and Tolling...............................................................................56

Class Allegations..............................................................................................................57

Causes of Action..............................................................................................................60

Prayer for Relief...............................................................................................................62

Jury Demand.....................................................................................................................62

ii

Plaintiff Gary T. Dunkin, on behalf of himself and all others similarly situated, brings this action against defendants Bowtech, LLC ("Bowtech"); Hoyt Archery, Inc. ("Hoyt"); Mathews Archery, Inc. ("Mathews"); and Precision Shooting Equipment, Inc. ("PSE") (collectively "Manufacturer Defendants"), BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops"); Cabela's LLC ("Cabela's"); Dick's Sporting Goods, Inc. ("Dick's Sporting Goods"); Jay's Sporting Goods, Inc d/b/a Jay's Sporting Goods, ("Jay's Sporting Goods"); Kinsey's Outdoors, Inc. ("Kinsey's"); Rogers Sporting Goods Holdings, Inc. ("Rogers"); and Lancaster Archery Supply, Inc. ("Lancaster") (collectively Defendant "Retailers" and/or "Distributors"), and industry trade association Archery Trade Association, Inc. ("ATA") (collectively with other Defendant groups, "Defendants"), as well as TrackStreet, Inc. ("TrackStreet") and NeuIntel LLC, d/b/a PriceSpider f/k/a Oris Intelligence ("Oris") (collectively "Software Co-Conspirators") (collectively, "Defendants"), for their unlawful contract, combination, or conspiracy to fix the prices of Archery Products sold throughout the United States, and in support thereof states:

## NATURE OF THE CASE

1. This case arises from Defendants' unlawful agreement, beginning no later than January 1, 2014, and continuing today, to artificially inflate the retail price of Archery

1

Products.[1]

2. Defendants are the largest and most powerful Archery Product manufacturers, retailers, distributors, brands, suppliers, and trade associations in the United States.

3. Defendants conspired, colluded, and entered into an agreement to artificially raise, fix, maintain, or stabilize prices of Archery Products at supracompetitive levels. Defendants' actions resulted in Plaintiff and members of the Classes paying supracompetitive prices for Archery Products in the United States and its territories. Defendants' anticompetitive conduct violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

4. Defendants engaged in concerted action to implement and enforce minimum advertised price ("MAP") policies with the intended purpose of "eliminat[ing] the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices." In this context, Defendants' MAP policies are effectively price floors for Archery Products.

5. Defendants' scheme to fix Archery Product prices included the joint exchange of competitively sensitive information through the ATA. Indeed, the ATA was the chief facilitator of Defendants' unlawful and anticompetitive conduct, including MAP training, clandestine communication channels, private events and other opportunities for

---

[1] "Archery Products," as used herein, includes but is not limited to, (1) bows (compound bows, recurve bows, longbows, and crossbows) and their components; (2) arrows and their components (shaft, fletching, and nock, but not excluding the arrowheads themselves); (3) arrowheads (or arrowpoints) which includes broadheads and field points; (4) targets (bag targets, foam targets, and 3D targets); and (5) accessories (bow cases, arrow quivers, sights, scopes, and stabilizers).

2

Defendants to meet and discuss the industry, signaling, and other invaluable resources that served as the backbone to Defendants' successful price fixing agreement.

6. By precluding pricing competition, Defendants artificially raised prices for Archery Products to supra-competitive levels at the expense of Plaintiff above the prices they would pay if there was free competition within the Archery Product market.

7. As a direct result of Defendants' anticompetitive and unlawful conduct, persons and entities that purchased Archery Products directly from the Defendants or their co-conspirators suffered antitrust injury in the form of paying supracompetitive prices.

3

## PARTIES

### I.    Plaintiff

8.  Plaintiff Gary T. Dunkin is a citizen of Norborne, Missouri, located in Carroll County, which is a part of the Kansas City division for the Western District of Missouri. Plaintiff Dunkin purchased one or more Archey Products subject to MAP policy pricing during the Class Period. Plaintiff Dunkin's purchases include but are not limited to, dozens of arrows purchased at Rogers Sporting Goods in Liberty, Missouri in 2025. Plaintiff Dunkin suffered antitrust injuries as a direct result of Defendants' unlawful conduct by paying higher prices for Archery Products purchased.

### II.    Defendants

#### A.  Bowtech, LLC

9.  Defendant Bowtech, LLC ("Bowtech") is a part of the larger entity, "Pure Archery Group," acquired by JDH Capital in 2022. Pure Archery Group advertises itself as the "leading archery manufacturer" and is made up of brands including Bowtech, Excalibur Crossbow, Diamond Archery by Bowtech, Black and Gold Premium Bowsights, Ripcord, TightSpot by Black Gold, and Octane.[2] Along with its products, Pure Archery Group and Bowtech provide dealers with advertising services, business management services, and

---

[2] Bowtech Inc. has been registered to do business since at least 1999 but has since changed entity names and began doing business under "Bowtech, LLC" in 2022, following JDH Capital's acquisition. Any mention of Bowtech, Inc. and/or Bowtech, LLC within this Complaint and hereafter is meant to be interchangeable by Plaintiff.

4

business administration assistance. At all relevant times, Bowtech was a member of the ATA while having a representative on its Board of Directors for multiple years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### B.  Hoyt Archery, Inc.

10. Hoyt Archery, Inc. ("Hoyt") is incorporated in the State of Utah with its principal place of business in Salt Lake City, Utah. Before Hoyt's merger and, thus, incorporation in Utah in 2006, it was incorporated and registered to do business in the State of Missouri in 1959 under "Hoyt Archery Company, Inc." Hoyt began its manufacturing of bows in Saint Louis, Missouri before eventually upgrading to a 150,000 square foot facility in Salt Lake City, Utah. Throughout the past century, Hoyt has claimed itself as an industry leader and world-renowned brand in archery and bowhunting. At all relevant times, Hoyt was a member of the ATA while having a representative on its Board of Directors for multiple years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### C.  Mathews Archery, Inc.

11. Mathews Archery, Inc. ("Mathews") is incorporated in the State of Wisconsin with its principal place of business in Sparta, Wisconsin. Mathews aims to maintain every aspect of the bow build in-house, and claims itself to be the largest bow manufacturer in

5

the world. There are approximately 15 retail locations currently selling Mathews Archery Products within 100 miles of Kansas City. At all relevant times, Mathews was a member of the ATA while having a representative on its Board of Directors for many years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### D.  Precision Shooting Equipment, Inc.

12. Precision Shooting Equipment, Inc. ("PSE") is incorporated in the State of Delaware with its principal place of business in Tucson, Arizona.[3] In 2023, PSE was acquired by Heritage Outdoor Group, a holding company designed to acquire existing outdoor brands. At all relevant times, PSE was a member of the ATA while having a representative on its Board of Directors for multiple years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### E.  BPS Direct, LLC d/b/a Bass Pro Shops

13. BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops") is incorporated in the State of Delaware with its principal place of business in Springfield, Missouri. Bass Pro Shops describes itself as "North America's premier outdoor and conservation company,"

---

[3] Any mention of Precision Shooting Equipment, Inc. includes the related entities "Precision Shooting Equipment, LLC" and "Precision Shooting Equipment HoldCo 2023, LLC" within this Complaint and hereafter is meant to be interchangeable by Plaintiff. On information and belief, these three entities make up what is known as "Precision Shooting Equipment" after Heritage Outdoor Group acquired PSE in 2023. All three entities are incorporated in Delaware and headquartered in Arizona.

6

while its national headquarters store, located in Springfield, Missouri, offers more than 500,000 square feet of one of the largest assortments of outdoor gear, apparel, and gifts. In 2017, Bass Pro Shops acquired the outdoor brand Cabela's LLC. Bass Pro Shops has at least three storefront locations in the Kansas City metropolitan area. At all relevant times, Bass Pro Shops was a member of the ATA while having a representative on its Board of Directors consistently throughout the years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### F.  Cabela's LLC

14. Cabela's LLC ("Cabela's") was incorporated in the State of Delaware from 2003 until 2017, and had its principal place of business in Sidney, Nebraska.[4] Since Bass Pro Shops acquired Cabela's in 2017, Cabela's principal place of business has been Springfield, Missouri. Until 2017, Cabela's was a member of the ATA while having a representative on its Board of Directors for multiple years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

---

[4] In 2017, Bass Pro Shops acquired Cabela's and has since placed Cabela's under the Bass Pro Shops brand name as its subsidiary. Any mention of Cabela's LLC after 2017 by Plaintiff includes its parent company Bass Pro Shops within this Complaint and hereafter.

### G. Dick's Sporting Goods, Inc.

15. Dick's Sporting Goods, Inc. ("Dick's") is incorporated in the State of Delaware with its principal place of business in Coraopolis, Pennsylvania. Dick's describes itself as the "leading omnichannel retailer" and serves athletes and outdoor enthusiasts in more than 850 store locations as well as online. Dick's has at least four storefront locations in the Kansas City metropolitan area. At all relevant times, Dick's was a member of the ATA, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### H. Jay's Sports, Inc. d/b/a Jay's Sporting Goods

16. Jay's Sporting Goods, Inc. ("Jay's Sporting Goods") is incorporated in the State of Michigan with its principal place of business in Clare, Michigan.[5] Jay's Sporting Goods describes itself as one of the "leading sporting goods stores for all things outdoors." At all relevant times, Jay's Sporting Goods was a member of the ATA while having a representative on its Board of Directors most years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

---

[5] Any mention of Jay's Sports, Inc. and/or Jay's Sporting Goods by Plaintiff includes Jay's Outdoors, LLC and/or its affiliates Shops within this Complaint and hereafter.

8

### I. Kinsey's Outdoors, Inc.

17. Kinsey's Outdoors, Inc. ("Kinsey's") is incorporated in the State of Pennsylvania with its principal place of business in Mount Joy, Pennsylvania. Kinsey's serves more than 7,000 retailers nationwide with a strong assortment in archery, ammunition, and firearms. At all relevant times, Kinsey's was a member of the ATA while having a representative on its Board of Directors most years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### J. Lancaster Archery Supply, Inc.

18. Lancaster Archery Supply, Inc. ("Lancaster") is incorporated in the State of Pennsylvania with its principal place of business in Leola, Pennsylvania. Lancaster represents itself as leading the world in 3D and Target Archery, having the largest selection of top-quality 3D, Target, Bowhunting, and Traditional Archery equipment in the world. At all relevant times, Lancaster was a member of the ATA while having a representative on its Board of Directors for multiple years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### K. Rogers Sporting Goods Holdings, Inc.

19. Rogers Sporting Goods Holdings, Inc. ("Rogers") is incorporated in the State of Missouri with its principal place of business in Liberty, Missouri. Plaintiff Dunkin

9

purchased his Archery Products subject to MAP pricing at Rogers. At all relevant times and on information and belief, Rogers was a member of the ATA, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### L.  Archery Trade Association, Inc.

20. Archery Trade Association, Inc. ("ATA") is incorporated in the State of Virginia with its principal place of business in New Ulm, Minnesota. The ATA is the trade association that represents the economic interests of corporations involved in the manufacture, wholesale, retail, sales, and distribution of Archery Products. The ATA's quarterly Retail Trend Tracker Survey provides "retailer and manufacturer members with valuable information specific to product categories, price points, inventories and confidence at the regional and national levels." At all relevant times, the ATA engaged in and facilitated the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### M. TrackStreet, Inc.

21. TrackStreet, Inc. ("TrackStreet") is incorporated in the State of Delaware with its principal place of business in Las Vegas, Nevada. At all relevant times, TrackStreet provided Defendants with software to create, track, and enforce their MAP policies. In particular, TrackStreet provides brands with digital tools to track and enforce pricing policies such as MAP policies. Features include on demand notifications of MAP

10

violations and customizable messages to send to violators. In addition, TrackStreet also helps clients to formulate pricing policies, including MAP policies. At all relevant times, TrackStreet engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### N.  Neuintel LLC, d/b/a Pricespider Holdings LLC, f/k/a Oris Intelligence

22. Neuintel LLC, d/b/a PriceSpider Holdings LLC, f/k/a Oris Intelligence ("Oris") is incorporated in the State of California with its principal place of business in Irvine, California. At all relevant times, Oris provided Defendants with software to create, track, and enforce their MAP policies. In particular, Oris touts its MAP monitoring solution, Prowl, as "the world's most advanced MAP monitoring software." Oris also advises on the content of MAP policies and provides MAP violation letter templates. At all relevant times, Oris engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

23. Various other individuals and entities that are not named as defendants herein participated as co-conspirators with Defendants in the violations alleged herein and performed acts and made statements in furtherance of the conspiracy. Co-conspirators include, but are not limited to, all other entities that were ATA members at any relevant time.

11

### JURISDICTION, VENUE, AND COMMERCE

24. This case arises under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) and seeks injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

25. This Court has federal question subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337, and Section 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

26. Venue is proper in this District under 15 U.S.C. §§ 15 and 22, and under 28 U.S.C. §1391(b), (c), and (d) because at all time relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substant part of the events giving rise to Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District, including but not limited to:

    a.  Defendant Bass Pro Shops is domiciled within this District;

    b.  Defendant Cabela's is domiciled within this District;

    c.  Defendant Rogers is domiciled within this District;

    d.  Plaintiff Dunkin is domiciled within this District and purchased his Archery Products at issue within this District; and

    e.  Plaintiff Dunkin's purchasing records of his Archery Products at issue are located within this District.

12

27. This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an illegal anticompetitive scheme that was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District. Defendants should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

28. Defendants' activities were intended to and did have a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants sell their products and services in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

## FACTUAL ALLEGATIONS

29. The Archery Products market has seen significant growth in recent years. Archery participation in the United States has more than doubled since 2000, growing from approximately 7 million to 19 million in 2025. Similarly, a participation survey by the National Sporting Goods Association revealed 107.2% growth from 2003 to 2017. The value of the Archery Products market has also increased, growing from barely $100 million in 1974, to $535 million in 2004. By 2023, the market was valued at around $1.2 billion.

13

30. Significant growth in demand and value has caused an influx of entities trying to enter the market. Increased competition should lead to better products and lower prices. The threat to margins was the impetus of Defendants' unlawful conduct.

31. Archery Products are sold to consumers by retailers. Retailers purchase Archery Products either directly from manufacturers, or through distributors who purchase directly from manufacturers. In general, multi-channel retailers, such as national sporting goods stores, source their Archery Products directly from manufacturers, as do locally-owned specialty retailers such as larger pro shops (approximately 20%). Smaller pro shops (approximately 80%) tend to source their Archery Products through distributors.

32. Archery Products are expensive. Consumers can spend upwards of thousands of dollars on a single bow, and easily as much on the necessary accessories. In general, retail profit margins are about 27% on bows and 40% on other Archery Products (e.g., accessories and arrows).

33. Defendants adopted and enforced MAP policies to protect "margin integrity."

I.     MAP, Generally

34.  Minimum Advertised Pricing, or "MAP" policies, saw some use in the early 2000s but were generally uncommon and unenforced. The introduction of the internet stimulated a change, however, as consumers were not able to browse different products and prices efficiently. According to Defendant Kinsey's, it was the first distributor to team up with its vendors and force compliance.

14

35. In theory, MAP policies only set the minimum price that an Archery Product may be advertised for, rather than sold. Accordingly, under traditional MAP policies, the retailer is free to choose what price to actually sell their products for.

36. Defendant retail stores carry out considerable amounts of advertising, and Defendant manufacturers of Archery Products want their Products promoted within these advertisements. To secure this advertising, Defendant manufacturers will pay a fee to Defendant retailers.

37. Historically, retailers were allowed to price products below the MAP pricing in non-co-operative advertisements, that is, those advertisements that were paid for entirely by the retailer. Although the MAP policies of manufacturers and/or distributors technically allowed retailers to price their products at any price, the retailers were not allowed to communicate to consumers via media or in-store advertising that they were willing to sell the products for less than the respective manufacturer or distributor's MAP. Even retailers that were skeptical of the MAP policies soon succumbed to the anticompetitive scheme due to the considerable financial consequences of violating MAP.

38. Defendants' MAP policies set both. As one industry retail veteran explained: "If a customer complains that you won't sell them a bow below MAP pricing, you must educate them that bow manufacturers set the MAP pricing as a policy that dealers must follow. In other words, they must understand that stores who sell below MAP are dishonest and likely won't be around long."

15

## II.    The ATA is the Central Hub for Archery Product Suppliers

39. The Archery Trade Association ("ATA") is the primary archery trade group in the United States with over 2500 members as of 2023 – up from roughly 500 members in 2000. No consumers may join. Rather, the ATA is predominantly composed of would-be competitors: roughly 80% of ATA members are part of the Archery Product supply chain (*i.e.*, manufacturers, distributors, and retailers).

40. The ATA's website outlines the process for joining the association: ATA membership is categorized "based on the verification documents provided. Each membership category description includes a list of the required verification documents for that category." Membership categories include Retails & Range; Manufacturers & Distributors; Archery Service Professionals; Media; Sales Representative; and others.

41. ATA membership comes with significant benefits, including access to trade shows and events, online forums, training videos, a directory, access to key industry data, and other resources.

42. ATA member-exclusive events and resources provide significant opportunities for competitors to discuss shared financial interests or other competitive information regarding Archery Products. The ATA's Board of Directors, the ATA Retail Council, the annual ATA Trade Show, and "ATA Connect" all provide the Defendants opportunities to meet and conspire about implementing and enforcing MAP policies on Archery Products without the presence of consumers.

### A.    ATA Board of Directors

43. The ATA's Board of Directors "guides ATA actions and shapes the organization's policies and positions." Defendants at each level of the Archery Products supply chain have occupied Board positions throughout the conspiracy.

44. Throughout the conspiracy, there have been horizonal competitors on the ATA Board of Directors. For example, Manufacturer Defendants BowTech, Hoyt, Mathews, and PSE were all ATA Board members in 2018 and 2019. Similarly, Retailer Defendants BPS, Cabela's, Jay's Sporting Goods, and Kinsey's were all Board Members in 2015, and two or more of these Retailer Defendants were acting as Board Members from 2014 through 2024.

45. ATA Board members openly support strict MAP policy adoption and enforcement. For example, one ATA Board member credited his high sales and margins to Defendants' strict enforcement of MAP policies, stating: "We're doing everything we can to enforce our MAP guidelines, and people know we take it seriously. Every two weeks we actively go after everything we can find on the internet. We have an in-house guy who stays after it. You need to watch and learn how their operations work. When we figure out what they're doing we cut them off."

46. In addition to MAP enforcement, the ATA has also introduced anticompetitive rules and guidelines to artificially reduce competition and increase prices in the Archery Products market in the United States.

17

B.    ATA Retail Council

47. The ATA Retail Council's stated purpose is to "improve the industry's archery and bowhunting markets." Like the ATA Board of Directors, there have been multiple Defendants, including otherwise horizontal competitor Defendants, on the ATA Retail Council at all relevant times.

48. Led by ATA Board members, the ATA Retail Council "meets weekly to discuss pressing issues raised during strategic-planning meeting[s]," which commonly includes MAP policies and their enforcement. Indeed, Kurt Smith, the ATA's Director of Industry Relations for the Retail Council, explained that MAP policies are "probably one of the most talked about topics in the archery industry," and further advised that industry participants establish and enforce MAP policies so "distributors and retailers [can] catch violators [and] cut them out of the supply chain and force them to look for easier prey."

49. Other Retail Council members have similarly expressed the need for industry-wide implementation, enforcement, and compliance. For example, one Retail Council member is on record stating that all Archery Product manufacturers "should create MAP policies and retailers should honor them … every business must work together as a group to be productive and profitable, which includes strong MAP policies and procedures." Another Retail Council member warned against a lack of compliance, stating "disobeying MAP policies … can have big consequences."

18

C.    ATA Trade Shows

50. The ATA hosts an annual Trade Show. Since 2011, Trade Show attendance has been limited exclusively to ATA members to "prevent[] the attendance of those who undercut the ATA's pro shop dealers…." This chance was widely supported by ATA members, and the ATA has since rejected all requests to expand attendance.

51. ATA Trade Shows bring together horizonal competitors from each level of the Archery Products supply chain, including Defendants. ATA Trade Shows receive excellent attendance. For example, the 2016 ATA Trade Show saw "every major bow manufacturer [] present and accounted for," as well as 1,168 retail and distribution companies also in attendance.

52. As Jay's Sporting Goods General Manager, Mark Copeland, explained, "[t]he Trade Show is the one place where nearly everyone in our industry does business…. It provides the perfect opportunity for retailers to talk face to face with Retail Council members. The retailer is in the trenches every day working to develop archers. To better our industry, we'd love to know what topics we should take to the ATA Board on your behalf."

53. MAP policies are commonly and openly addressed at ATA Trade Shows. For example, at one ATA Trade Show, a leading archery company advertised that it "aggressively enforces its MAP policies" on its booth. Similarly, the 2015 ATA Trade

19

Show included a meeting of about 60 manufacturers, distributors, and retailers to review sample MAP/MPR policies.

**D.    ATA Connect**

54. ATA Connect is an "online discussion community created exclusively for ATA members," which provides a "safe, confidential space" for members to "discuss hot topics among themselves – and work together to find solutions."

55. At all relevant times, ATA contained at least two members-only sub-communities: MyATA Network and Retail Growth Interact Community.

56. MyATA Network was available to all ATA members.

57. Retail Growth Interact Community is limited to ATA members that operate as retailers. The expressed purpose of this community is to give retailers an opportunity "[t]o communicate with other retailers and learn how they stay ahead of the learning curve," as "a confidential space for retailers to network and find solutions to business challenges through constructive discussions." Further, the ATA has explained that "Retail Growth Interact is a great place to share ideas and ask questions about the topics that matter most to your business, including buying patter[n]s, profit margins and what to charge for services."

58. At all relevant times, ATA Connect was used – at ATA's urging – for members to discuss MAP pricing in a confidential space. The ATA also encouraged its members to

20

use ATA Connect to "find solutions that boost business and benefit the industry by tackling topics like MAP policies."

59. ATA Connect also offers additional resources, including member and company directories.



### III. Defendants Agree to Artificially Inflate, Fix, Maintain, or Otherwise Stabilize Archery Product Prices

60. Starting January 1, 2014 – and potentially earlier – Defendants agreed, combined, or conspired to artificially inflate, fix, maintain, or otherwise stabilize Archery Product Prices in the United States. To implement their unlawful contract, combination, or conspiracy, the Manufacturer and Retailer Defendants – acting through, in concert with, or with the aid of the ATA and other co-conspirators – agreed to implement and strictly enforce sale price floors for Archery Products, under the guise of MAP policies. As a direct and proximate result of Defendants' intentional conduct, Archery Product prices were artificially inflated to supracompetitive levels and Plaintiff was thereby injured.

A.    **Defendants Implement Their Agreement with the Help of Bass Pro Shops and Cabela's**

61. Concern with prices, margins, and competition – in particular, those caused by the mainstream use of the internet – began rippling through the industry in the early 2010s. The ATA and its retailers facilitated communications, meetings, events, and other means for Defendants and others involved in the Archery Products supply chain to address these concerns.

62. One idea was MAP policies. While MAP policies saw some use at that time, they were far from widely accepted. Industry-wide implementation and vigorous enforcement would be needed for MAP policies to effectively control the prices of Archery Products. Indeed, in a September 2010 *Inside Archery* publication, the President of the National Archery Buyer's Association commented, "Frankly many manufacturers don't have a clue about minimum advertised pricing and why the industry needs it to survive. Consequently, we don't have much conformity in our industry." An article in the same edition of *Inside Archery* further explained that, "[a]lthough some manufacturers and retailers ask the [ATA] to step in and make dealers and online retailers adhere to MAPs, that would exceed the ATA's authority," with one member of the ATA's Board of Directors noting that "[t]here's nothing the ATA can legally do when it comes to enforcement. There's no rule the ATA can set down and say 'This is what you must do.'"

63. The pressure for ATA and industry intervention continued to grow, and in 2014, the ATA reversed course and took the firm position that all members should institute and enforce MAP policies.

64. The change in position was driven in large part by Bass Pro Shops and Cabela's, who joined the board in 2014. Indeed, as described by ATA's Tom McAninch:

> As I look back on the first year of the mega marts joining into our industry discussions, I have to say that if anyone other than [Cabela's] Tom Gallagher had been involved, we would not have had such a smooth and productive first year. With his cohort in crime, [Bass Pro Shop's] Dean Snelson, Tom quietly and in his unassuming, disarming way (which is his manner) allowed our Board members to see that the box stores [Cabela's and Bass Pro Shops] shared in our future and, more important, were serious about contributing to the success of the archery and bowhunting industry.

65. The support of industry powerhouses, Bass Pro Shops and Cabela's, in conjunction with the ATA, offered necessary resources, support, and assurances that if industry participants adopted and enforced MAP policies, then their competition would as well.

66. The ATA's new position on MAPs was memorialized in a December 31, 2014 blog post by ATA CEO Jay McAninch, titled "MAP: United We Stand, Divided We Fall." The blog highlighted that industry-wide adoption and enforcement were necessary for profitability, and McAninch urged other manufacturers and retailers to join forces and agree to the policies:

> Unfortunately, this unprecedented interest has increased competition so much that some companies ignore MAP (minimum advertised price) just to make a sale ….

23

MAP has been controversial largely because it's associated with price fixing, which means setting a minimum or maximum price for selling consumer goods. It's a complicated law, and recent Supreme Court decisions are causing ripples throughout lower courts and consumer-advocacy groups….

I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it. Everyone must participate because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone the ATA is the right group to facilitate this discussion and provide the vehicle for the industry to unite behind constructive, positive changes.

To ensure the industry addresses these issues, we've engaged the ATA Board of Directors, and the leader of [buying groups] ARRO [Archery Rancher and Retail Organization], NABA [National Archery Buyers Association], NBS [Nation's Best Sports] and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP. In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP. To that end, the ATA will offer our MAP policy as a template that companies can use as a tool if they take action.

We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action. This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it.

67. The ATA's template MAP policy was designed for the purpose of "protect[ing] our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product pricing." ATA also created a checklist of key considerations "for forming – and enforcing – a sound effective MAP policy."

68. The following year, the ATA Trade Show included a seminar on creating and enforcing MAP policies, with approximately 60 ATA members, including manufacturers, distributors, and retailers. A newsletter following the seminar reported advised members who "want[ed] to control the minimum advertised price (MAP) and/or the minimum resale price (MRP) of their products," they "must create [a] policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiation." The newsletter further warned that "Companies that don't set MAP/MRPs and enforce them risk profit losses as well as diminish their brand."

69. The February 6, 2015 ATA newsletter expanded on the MAP training offered at the annual trade show, explaining that "[t]he ATA cannot set or enforce MAP/MRP policies for the industry because it would violate antitrust laws. However, the ATA can provide help and information so individual manufacturers can craft their own policies, which the companies must then enforce themselves."

70. The newsletter also expanded on the sample MAP policy ATA offered in 2014, and then included a "three-step plan … to help ATA-member manufacturers and distributors adapt a sample policy for their own use."

71. As further assistance, the ATA published a MAP resource library for its members, which provided template policies and additional resources for retailers and manufacturers.

25

72. ATA's push for industry-wide adoption and enforcement worked. For example, Defendant Kinsey's announced an updated MAP policy in June 2015. In a corresponding press release, Defendant Kinsey's explained:

> MAP policies exist to benefit both retailers and manufacturers by elevating the perception of brand value, which leads to increased margins for retailers. Kinsey's stands behind manufacturers in their implementation of minimum advertised pricing to protect the interests of their brands, as well as margin integrity within the retail network.

73. As the June 2015 press release explained, however, implementation was not enough: vigilant enforcement accompanied by strict enforcement was necessary for the price floors to be effective because many product resellers purchase Archery Products from distributors or retailers (such as the Retailer Defendants) as opposed to directly from the manufacturers. The June 2015 press release further explained that, as part of Kinsey's MAP policy updates, it would be policing the MAP policies of Archery Products manufacturers, such as TenPoint Crossbow Technologies. Indeed, TenPoint Vice President explained that "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin. This MAP enforcement is important in order to keep the retailer base, and archery as a whole, healthy."

74. T.R.U. Ball Archery Releases/Axcel Archery Sights's ("TRU") MAP policy is the epitome of policing throughout the supply chain. TRU's MAP policy including the following penalties for violations:

26

**New MAP Violator**:

A warning will be issued. Violator will be evaluated in approximately two weeks to determine if they have raised prices to MAP levels.

**Repeat MAP Violator:**

First repeat infraction – Violators who have been notified that they are below MAP pricing within the last six months will be given a 48 hour warning to raise prices to MAP levels. Violators who have not rasised prices to MAP levels after this time period will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days.

**Second Repeat Infraction**

Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 60 days.

**Three or More Repeat Infraction**

Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for more than two times will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days.

75. Distributors who sold TRU Archery Products to other resellers (e.g., Cabela's supplying a small pro shop), were subject to additional conditions and penalties:

**Distributor Violators:**

T.R.U., Inc. will be using contracts from around the United States to purchase products from sources who are known to be violating MAP levels.

**First Infraction**

Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 30 days.

**Second Infraction**

Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 60 days.

**Third Infraction**

27

Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List indefinitely.

76. In a June 23, 2015 post on the industry forum *Archery Talk*, one retailer remarked, "My hope is that the ATA association [sic] is successful in establishing an industry wide rule set that will be enforced industry wide."

## B.    MAP Policies See Widespread Acceptance and Defendants Encourage Continued Enforcement

77. In a March 25, 2016 article titled "ATA Members Weigh in on MAP," the ATA reflected on its success in implementing MAP policies and highlighted its efforts thus far, stating, "More than one year later, there's still good news and bad. However, the ATA and its member companies have worked tirelessly to discuss, craft and enforce MAP policies that could help manufacturers, retailers and the industry."

78. The article included statements from several Archery Product suppliers, including Mike Ellig, the founder of Archery Products manufacturer Black Gold Inc. Mr. Ellig cited the pivotal role ATA's MAP policies and efforts had in his inflating his company's margins:

> I was ready to charge ahead, but as a small-business owner, I didn't know where to start and I didn't have two months to create a policy scratch. Jay [McAninch] connected me with the ATA's lawyers and provided resources I wouldn't have found otherwise out here in Bozeman, Montana.
> Black Gold's MAP policy has been in place about two years. Ellig said he notices more companies adhering to the MAP policy, and also has "cut off" people who wouldn't abide by it.

28

79. Ellig further highlighted that the implementation and enforcement of MAP policies would benefit the Archery Products suppliers as whole via higher margins, and encouraged others to embrace MAP policies even if it meant sacrificing profits in the short term. As provided in the article: "Enforcing MAP policies is up to every individual company," Ellig said. "It's a lot of extra effort. A lot of people will decide it's not worth the hassle because it's so much work. Some won't take time to do it, but the longer-term impact of doing it right is 10 times greater than the short-term impact of getting a sale for the archery industry."

80. Another Archery Products retailer and member of buying group ARRO stated, "[w]e have to educate our dealers about holding to the MAP as much as they can … [o]therwise [violators will] destroy the brick-and-mortar stores." This same retailer went on to note two "MAP Issues": (1) "Many sellers dodge MAP by selling a product and offering a $50 coupon or gift card. They sell the product so low that other retailers can't compete;" and (2) "Some manufacturers take the time and trouble to create MAP policies only to find they can't enforce them. That's really disappointing."

81. These comments reveal the true purpose of Defendants' MAP policies: stifle competition and artificially raise prices at the expense of consumers. They also highlight the pivotal role ATA plays:

> "It will take the ATA's power to educate retailers and manufacturers about the importance of upholding MAP policies," Stubstad said. "The cost of business continues to rise. For business to survive, we can't give our

products and services away. Manufacturers must approach this problem like it's enforcement and be determined to enforce their policies."

82. TRU's Director of Operations, Ben Summers, and Vice Chairman of ATA Board of Directors discussed MAP policies from the perspective of a "large manufacturer." Mr. Summers noted the primary difficulty with effectuating their scheme was a lack of vigorous enforcement would give competitors the opportunity to "cheat" on the agreement and steal sales by offering consumers better prices on Archery Products. Mr. Summers explained, "[i]f I'm really good at keeping my products at the MAP price, and I have a competitor who isn't keeping a MAP policy, and their product costs loss than mine, I can lose lots of sales." To that end, Mr. Summers recognized the ATA's pivotal enforcer role:

> Jay McAninch always talks about shining light in dark corners so people can be seen for what they're doing, and be held accountable," Summers said. "ATA's lawyers have shone that light by offering information on how to structure a MAP policy, providing examples of policies from other industries, and explaiing different tactics some companies use."

83. Bruce Hudalla offered the sales representative's perspective:

> MAP is a good thing for the archery industry … It keeps a level playing field and allows people to compete on product knowledge and customer service. As a sales rep, I support MAP because it maintains the value of products and allows my customers – retailers and manufacturers – to operate at profitable margins….
>
> ATA has done an excellent job getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts and sample policies, [and that] [i]f you have a [MAP] policy, it must be enforced.

84. Jay Scholes, co-founder of the marketing firm, Outtech, noted "we're responsible for upholding our sport, for making sure our retailers make money, and ensuring manufacturers also make money. MAP is a good thing for our industry." Mr. Scholes concluded, "[i]f we all believe we're in this business because we love the outdoors, we have a responsibility to uphold MAP to strengthen the industry."

85. Defendants' conspiracy continued to grow throughout 2016.

86. The 2016 ATA Trade Show featured a presentation on MAP policies by an Archery Products retailer, remarking that "many dealers might not know how to price certain products, but MAP helps them learn what profit margin they need to make their business survive," and "We have to educate our dealers about holding to the MAP as much as they can … [o]therwise [violators will] destroy the brick-and-mortar stores." Another attendee added that "[t]he archery industry is uniting as one, understanding we are all in this together, and that unity is ultimately what will help us grow."

87. 2016 also featured a plethora of additional resources offered by ATA for "Members Interested in MAP Policies," including "ATA [] resources about creating a MAP policy for your employer." These resources were only available to "ATA members," and were included in the price of membership.

88. In May 2016, nearly 40 ATA Retail Council members met for a "strategic-planning" meeting, including Council Chairman Mark Copeland (Jay's Sporting Goods General Manager). An August 30, 2016 article by *Inside Archery* included reflections on

31

this meeting from Mr. McAninch and Mr. Copeland. Mr. McAninch noted that, "Things are changing … It's clear from our strategic planning meeting that our industry understands that its success depends largely on the success of archery and bowhunting retailers. The ATA's Retail Council is rejuvenated, highly engaged and ready to help force a better future for everyone in our industry." Mr. Copeland emphasized the ATA Retail Council's pivotal role for obtaining industry-wide agreements: "I keep hearing that retailers are the industry's backbone. I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

89. The adoption and enforcement trend in 2016 was again witnessed in 2017. An early 2017 ATA article titled, "ATA Members Speak: Marketing, MAP, and What's Next," noted that MAP "enforcement is a hop topic these days," and asked "What's your take on MAP and why?" One archer retailer responded:

> We appreciate MAP policies and the companies that enforce them. When a company competitor enforces a MAP policy, we can stay profitable without having the showroom for a competitor who wants to undercut pricing. We started to discontinue stocking manufacturers who do not have MAP policies and don't enforce them, and those who supply Amazon.

90. In response to the follow-up question, "If you could play king/queen for a day, what needs to happen in the archery industry to benefit your company the most?" the same retailer replied, "We, the individual, brick-and-mortar retailers need quality products with solid margins backed up by advertising to consumers. We also need

manufacturers who are willing to enforce their MAP policies, not just those who just say they have MAP policies but don't do anything about the price games."

91. In July 2017, the ATA Board of Directors met at Hoyt headquarters and unanimously agreed to add an additional two seats for Archery Product buying groups, National Archery Buyers' Association ("NABA") and the Archery Range and Retailers Organization ("ARRO"). With these additions, ATA's Board of Directors now consisted of "three pro shops, two buying groups, one sales representative, two multi-channel retailers, and 12 archery and bowhunting manufacturers and distributors."

92. ARRO's executive secretary emphasized ATA's crucial role in "growing archery and bowhunting in recent years," as well as its significant efforts to help "retailers be more profitable." ARRO's executive secretary further explained that ARRO's goal with the board appointment was to strengthen the relationship and communication between ARRO, ATA and manufacturers.

93. Following up the Board meeting, ATA published an article titled "MAP: What is it? Why Does it Exist?" The article reiterated and expanded on ATA's long signaled position that the industry should adopt MAP policies and provide assurance to competitors that they will do the same. The article explained that MAP policies "level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices. The policies also help manufacturers protect their integrity, maintain their worth and stabilize their brand." The article also

33

warned of the dangers price competition posed to Archery Product suppliers: "small-business owners with brick-and-mortar shops lose business because they can't compete with online markets where consumers can easily compare prices with their smartphone or desktop computer," and that "[e]ventually, the archery industry itself suffers, which has widespread impacts, built as it is on a foundation of manufacturers and retailers supporting hunting, conservation and recreational shooting."

94. The article further highlighted ATA's crucial role to the conspiracy:

> The Archery Trade Association's Board of Directors and its Retail Council members are discussing how to solve those problems and ensure the longevity of brick-and-mortar retailers, who form the industry's core. ATA members regularly weigh in on MAP, and the conversation continues. While the ATA works with manufacturers to establish and enforce good MAP policies, you can get involved in several ways.

95. The ATA outlined a list of actions members could implement to address price competition. First, ATA encouraged members to "[s]tart by following good MAP policies, which means those enforced by manufacturers." The ATA further encouraged members to call manufacturers that do not have or enforce MAP policies and "express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy."

96. The article also features a quintessential conspiracy signaling statement from Ryan Shutts, Cabela's Merchandising Director, and an ATA Retail Council member: "every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures."

34

97. The article also emphasized the inflated profits Archery Product suppliers could reap from consumers by collectively implementing and enforcing MAP policies:

> [MAP policies] help retailers stay in tune with the market and margin expectations. In other words, if you understand and follow a manufacturer's MAP policy, you'll be better positions to make more money and run a successful business…
>
> If you follow MAP and work within that price structure … [t]hat puts you in a better position financially than cutting the cost of a product and disobeying MAP policies, which can have big consequences…
>
> When you're part of the solution, you'll make more money.

98. In October 2017, ATA rolled out additional MAP resources as part of its introduction of the "MAP Resource Library." The corresponding press release stated:

> ATA staff are compiling manufacturers' MAP policies and positing them in the Members-Only area of the ATA website. This MAP Resources Library helps retailers learn which manufacturers have MAP policies, and helps retailers to understand and comply with them. Several policies are already posted, and the ATA will add more as manufacturers provide them.
>
> If you're a manufacturer and need help monitoring how well retailers adhere to your MAP policy, the ATA can help you, too. MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers.
>
> The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library. If your company has a MAP policy, or if you have questions, contact Wesley Lang, ATA membership manager, at wendyland@archerytrade.org. To capitalize on these ATA-member benefits, join the Archery Trade Association today.

35

99. In addition to providing a central repository for MAP policies of all ATA members, the MAP Resource Library functioned as a conspiratorial hub where competitors functionally signed an agreement not to compete with one another on price for Archery Products. Absent an agreement or the ATA's facilitation, Archery Product suppliers could not institute price floors because they could not be certain – and in fact would otherwise expect in a competitive environment – that their competitors would not undercut their pricing and steal business. Compiling and publishing all ATA member MAP policies thereby ensured compliance: ATA members now had a complete list of "competitors" that would not compete on price.

100. ATA's introduction of the MAP Resource Library also highlights the paradigm shift in ATA's industry involvement. The once neutral participant who refused to get involved was now an active, knowing, and intentional facilitator of Archery Product price manipulation.

36

101. The firms ATA "secured special discounts with" that "monitor and enforce MAP policies" were Defendant co-conspirators TrackStreet and Oris. Both of these firms offered digital platform programs that enabled users to track and enforce pricing policies, such as MAPs. In a since-deleted image hosted on the ATA website, Oris advertised "Actionable insights that preserve pricing integrity – from the outdoor industry to housewares, and everything in between. ORIS helps manufacturers protect their brands":



102. A 2019 ATA article described TrackStreet and Oris as providing "'web-crawlers' and other high-tech software to scour the internet for MAP violators.'" The article further explained that TrackStreet and Oris "know how to find out who's violating [MAP], identify their fictitious names, and track them as they move around to undercut our members."

103. On information and belief, the services TrackStreet and Oris provided were not merely violator identification but also notices to MAP violators and tracking information on seller violations such as when and how often the seller engaged in MAP violations.

104. The cost of obtaining similar services can exceed $1,000 per month, and for mid-size companies can exceed $20,000 per year. Given the high price of services, Archery Product suppliers would otherwise have no reason to purchase these services unless they were of real value. Here, Oris and TrackStreet increased Defendants' profitability and offered a more efficient enforcement mechanism. If they did not, Archery Product suppliers would stop subscribing. Thus, the financial viability of TrackStreet and Oris is inextricably intertwined with the Archery Products industry. TrackStreet and Oris understood and profited from their role in the conspiracy, and thus share in the antitrust liability with the other Defendants.

105. Coinciding generally with the release of the MAP Resource Library, the ATA added a new – since deleted – webpage specifically for MAP policies. The webpage described how a MAP policy "ensures all retailers compete fairly and evenly on service instead of price." The webpage also outlined ATA's position that "[r]etailers are responsible for knowing MAP policies and adhering to them."

106. In November 2017, the ATA rolled out ATA Connect, which provided an ATA-member exclusive community with the purpose of providing a confidential space for industry participants to discuss potential solutions to industry problems. In an article

38

published in conjunction with the introduction of ATA Connect, the ATA explained industry participants should use ATA Connect to "find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work." A follow-up blog post by ATA CEO Matt Kormann verified ATA Connect was being used to discuss MAP policies: "The topic atop the list of many ATA members during and immediately after #ATA2019 has been internet retailing and minimum advertised pricing. ATA Connect participants have been discussing both topics, with retailers and manufacturers alike vocal in their opinions."

107. In May 2018, the ATA Retail Council met near Alma, Wisconsin, which included conversations about the topics they anticipated retailers to address on ATA connect. These topics included:

Making money from your wrenches and work bench,
How ATA ePro helps archery retailers,
Minimum advertised price policies,
New-product release dates,
Setting profitable sales margins,
Vetting and hiring employees,
Finding and compensating good bow techs,
Evaluating your store's market value,
Boosting profits from lanes and lessons,
Do online sales really hurt your business?

108. In a 2019 article, the ATA noted that ATA Connect was still being used by ATA members to discuss otherwise confidential business information and strategies: "The hottest current topic on ATA Connect is managing inventory as new compound bows hit

39

the market. Retailers are also discussing ways to communicate with suppliers to ensure positive, profitable partnerships."

109. Within ATA Connect, the ATA created an ATA-member retailers exclusive channel called ATA Connect's Retail Growth Interact. According to the ATA, this retailer exclusive channel ensured it was "productive and solutions-focused." ATA described the purpose of the channel as follows:

> Retail Growth Interact is a great place to share ideas and ask questions about the topics that matter most to your business, including buying patters [sic], profit margins and what to charge for services. Together we can address industry challenges, boost your bottom line, and promote archery and bowhunting.

110. Soon after introducing Retail Growth Interact, the ATA introduced My ATA Network, which was another members-only channel the ATA described in the following way:

> Distributors, manufacturers, retailers and other ATA members have different business goals, objectives and operations. That's why the ATA is creating My ATA Network, an open forum that helps all ATA members work together to grow archery and bowhunting participation while boosting their businesses.

> My ATA Network on ATA Connect will debut before January, making it available for the 2019 Trade Show. The Retail Growth Interact community is reserved for ATA-member retailers, but they'll also have access to the My ATA Network.

111. The intended purpose of ATA Connect and its various channels was the clandestine exchange of competitive sensitive information on Archery Products and related services between competitors.

40

112. In addition to encouraging participants to exchange confidential information through ATA Connect, in 2018, Retail Council Members "agreed they must encourage more retailers to share profitable tips and strategies for sales and marketing," including by soliciting and sharing competitive information directly between competitors. As one Retail Council Member explained, "[t]his isn't about retailers fighting with manufacturers and telling them how to do their jobs; it's about sharing ideas that help retailers and manufacturers succeed." Another Retail Council stated, "[w]e want retailers to chime in with ideas on what works at their stores, what doesn't, and why," as well as, "[h]ow much do you charge for labor? What's selling this year in your area? Are the same products selling in Pennsylvania, California and Michigan? They can help each other a lot."

113.  Also in 2018, ATA introduced ATA Connect: Polls. As part of this program, "ATA staff conduct polls on ATA Connect every other week." The polls are "measures of where ATA members stand on industry issues," and by answering, "members learn how they align with each other." ATA further explained that "[t]hese polls also help the ATA's Retail Council and other committees see if they're representing their peers when working with the ATA Board of Directors."

C.  **Defendants Continue to Urge MAP Enforcement as the Conspiracy Continues Through the Present**

114. Defendants had achieved wide-spread acceptance of MAP policies by at least 2019. As a direct and proximate result, Defendants were able to obtain significant profits

41

from artificially inflated Archery Product prices – all at Plaintiff's expense. Indeed, in a 2019 ATA article, TRU's Ben Summers boasted the company's "'really high' sales the past year" as a result of "good MAP policies and relentless enforcement."

115. Similar to the TRU's MAP policy, Kinsey's described their 2019 MAP policy as follows: "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with our vendors to build a 'do-not-sell' list." Kinsey's further explained that "[i]f your company has fallen below MAP prices, you will be restricted from purchasing these products from Kinsey's South effective immediately."

116. To continue to reap the margins from artificially inflated Archery Product prices, ATA emphasized the need for constant policing of MAP policies and exposing and punishing retailers or distributors who attempt to compete on price. As ATA's Director Industry of Relations, Kury Smith explained, ensuring MAP policy compliance is "a constant whack-a-mole or cat-and-mouse game with people who just want to make a quick buck," and people "who aren't worried about long-term profitability." Smith further stressed the need for concerted action: "The big thing will always be communication and teamwork," because "[e]nforcing MAP will never get easier. That's why it's so important for ATA members to work together as much as possible. "

117. On March 20, 2019, Mr. Smith hosted TrackStreet's Ryan Erickson on ATA's podcast Beyond the Bow in an episode titled "MAP Policies and Enforcement." Mr.

42

Erickson explained collective action was necessary for MAP policies to effectively inflate prices, noting that "nobody wants to be the first soldier through the way … they tend not to turn out too well … [but] as soon as a couple of big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward."

118. Defendants continued to use the ATA and other industry publications to signal the market and their co-conspirators to the cause of precluding competition and raising prices via MAP policies. In 2020, ATA CEO Matt Kormann published a block post titled "CEO Blog: Importance of MAP," writing:

> Buying habits have also changed for consumers and business owners. We can't turn back the clock and delete the internet – no matter how appealing that might sound, especially to parents. That evolution keeps MAP in a spotlight. With just a couple of taps on an iPhone we can pull up our competitors' retail pricing. For pro shops, that means it's easier to identify potential violations of MAP policies.
>
> The first reaction might seem obvious: Manufacturers with solid MAP policies should be out there policing their retail channels. The reality is more complex. Doing so takes time and resources during a stretch in our industry where both are running at premiums. It might be even more simple to assume every retailer should just follow those policies, but as long as we live in a free and competitive market, some business owners will make decisions others do not like.

119. The August 2019 edition of *Inside Archery* featured a front-page story titled "Kinsey's: Branching Out, But True to Its Roots," which discussed MAP policies at length and confirmed to the industry Kinsey's continued commitment to industry-wide MAP enforcement:

43

Kinsey's is using its far-reaching influence to help enforce MAP policy. This effort is also geared towards helping dealers and strengthening the industry at large.

"We work closely with our vendor partners and retail partners to monitor and enforce MAP policy," [Kinsey's CEO] Justin Gorman said. "There are a lot of methods out there, and there really is no simple solution, but by working together, we have the ability to bring positive change to the industry."

120. Mr. Gorman also explained Kinsey's extensive efforts to discipline violators: "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with vendors to build a 'do-not-sell' list."

121. Quoting Mr. Gorman, the *Inside Archery* article also stressed the continuing necessity of collective action: "Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules."

122. The December 2019 edition of *Inside Archery* reported that Victory Archery spends a considerable amount of time and energy to enforce MAP pricing.

123. Similarly, the January 2020 edition of *Inside Archery* re-published quotes by Kinsey's Justin Gorman and the above information regarding Victory Archery.

124. In 2020, ATA's Director of Industry Relations, Kurt Smith, and Manager of Retail Programs, Nicole Nash, publicly detail tips on creating a sales plan that leads to "A Successful business. And money." These public tips found within the *Hunting Retailer*

44

supposedly led to an "organized, efficient plan with sound advertising and marketing strategies" that helps "determine how much inventory to stock, when to promote markdowns and how to attract customers." Although Smith and Nash encourage using several different advertising methods for selling Archery Products, they specifically make a point to remind manufacturers, distributors, and retailers to "adhere to minimum advertised price policies on items you sell. To ensure you understand MAP policies, contact the ATA's business office at (507) 233-8130."

125. Defendants continue to signal and otherwise reaffirm their commitment to the conspiracy. This has the effect of both enabling compliance by those already in agreement, as well as encouraging additional members to join. For example, in March 2020, PSE General Manager was quoted in an *Insider Archery* article stating, "[t]he industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors."

126. In the December 2020 edition of *Inside Archery*, Performance Archery's Manager, Phaen Pittman, offered that the "purchasing side is where we put a major emphasis on who we do business with and why … We're constantly researching to find the best products, backed by companies with strong MAP policies and good dealer margins."

127. In yet another example, industry sales consultant firm MWS Associates, Inc., was quoted in an ATA website article stating:

> We're all competitors, and we compete against each other through the season and the years. But we must grow the numbers in the industry, and to do that we must work together …. Realistically, the ATA does so much for the growth and health of the industry, and I think that largely goes unrecognized. Although we're all competitors in the industry, we all have the same goal, and that's to help the industry succeed. The ATA works on that, and reminds us to see the bigger picture.

128. Beginning in 2021, the ATA even began erasing references to its central role in the conspiracy throughout its website. Further, the ATA even began publicly encouraging its members to call to discuss any MAP questions.

129. In 2022, the ATA launched a members-only ATA Retail Business Tracker Survey, which served as another mechanism for Defendants to engage in the clandestine sharing of competitive sensitive information. The ATA described the reporting program as follows:

> As an archery business, data and reliable facts play a pivotal role in making critical decisions. To address that need, the ATA is launching a new quarterly survey to gain insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening nationally.

130. A subsequent article published on the ATA's website and titled "ATA Members Capitalize on Data Shared in ATA's Retail Trend Tracker Survey" outlined the process and goals of the survey:

> The ATA puts together a Retail Trend Tracker survey each quarter and sends the questionnaire to retail members in order to create relevant and

46

informative data about the state of the industry according to the retail shops' experience. The ATA then shares the data gathered from the survey with distributors, manufacturers and retailers in an easily digestible report. The data is provided collectively for each region.

131. The article further explained that it hopes its members would utilize the survey data to compare their businesses with competitors: "Since each region of the country is represented in the report, retailers and manufacturers can study any discrepancies in the results and adjust accordingly, based on the data in their region."

132. Another ATA article titled, "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data about Market Trends," outlined just how detailed the data being offered is, and included: (1) the percentage of merchandise sales by product category, types of bows, price ranges of bows, customer experience level, and foot traffic; (2) seasonal questions regarding what's trending and what's not, business challenges and what customers are saying; and (3) which price range customers are gravitating toward, as well as the percentage of sales of each product type; bows, accessories, and services such as coaching or bow technician work. Indeed, ATA itself declared that "[t]his data allows you to see how your shop compares to your peers."

133. ATA specifically advertised the Retail Trend Tracker Survey to manufacturers and retailers, explaining it gives them "a sense of how much inventory they should have on hand. Comparing your inventory with that of other shops in your region can help you determine whether what you have is working or give you a sense of how you might increase or decrease it."

47

134. ATA further explained that, "[t]ogether, our members are archery and bowhunting's most powerful and collective voice. Our hope is that this information will provide critical industry guidance as you look to thrive and adapt to emerging trends."

135. Leaving no room for doubt, additional advertisements confirm ATA's intent behind releasing this type of data was reduced price competition. Indeed, the ATA completed a similar survey concerning ATA members' prices for repairs and servicing of Archery Products, and advertised it as a way for members to "compare your service and labor rates to industry averages so you can see how you stack up against your peers." An accompanying ATA article confirmed this is exactly how ATA members used the data: in response to the question "What do you charge for your services?" one member replied, "Not enough. I was happy to see the bow-tech price comparison chart at the ATA show this year, and have intended to analyze what we charge and restructure it." The article concluded with a signal to members to not "sell yourselves short," and "price your work accordingly."

136. The Retail Business Tracker remained ATA member-exclusive until sometime in 2024. Until then, the survey compiled competitively sensitive information from ATA Board Members and distributed it to competing retailers, manufacturers, and distributors in the Archery Products business.

137. Thus, until 2024, these reports were completely unavailable to consumers. Now, consumers and other non-members can gain access to this data, but they must pay between $200 to $500 per report. ATA members continue to receive these reports for free.

138. ATA continues to urge and signal competitor acceptance and strict MAP policy discipline. In an ATA article titled, "Effective MAP Programs Means Nonstop Enforcement," Patrick Durkin writes, "Companies with effective MAP programs set clear policies and enforce them as if they're hunting coyotes, which means the season never ends and the challenge never dies." Further signaling concerted action, Barb Terry, Customer Relations and Training Director at TenPoint Crossbow Technologies, said "Smaller dealers can't compete with people who drop their prices below MAP. If they notify us, we'll follow up on it. We don't want to see someone [competitors] take money out of our customers' pockets." The article further explained that the "ATA has supporting members who can automate [the process of finding violators] so it's not so labor-intensive for the manufacturers."

## IV. Defendants Successfully Inflated Archery Product Prices to Supracompetitive Levels

139. Defendants' agreement to artificially raise, fix, maintain, or otherwise stabilize prices for Archery Products and to exchange competitively sensitive information regarding Archery Products has had the intended and foreseeable consequence of artificially raising the prices Plaintiff and Class Members pay for Archery Products.

49

140. The Defendants' horizontal agreement between would-be competitors, and vertical agreement up and down the supply, to raise prices through the implementation and enforcement of MAP policies actually did raise prices with two mechanisms:

a. First, when MAP policies are adhered to by a large amount of horizontal competitors, it eliminates the ability of these would-be competitors to publicly advertise lower prices and thus attract more customers (as it would in a competitive market). Irrespective of whether a retailer may ultimately offer below MAP pricing to an Archery Product consumer by different means, such as a coupon or discount, MAP policies prohibit the advertisement of this lower price. Therefore, there is no incentive for these would-be competitors to lower their prices when there is a slim chance the lower price will be recouped by a higher sales volume.

b. Second, even if some retailers do end up offering these discounts or coupons on MAP prices, the industry-wide adoption of one price set unilaterally by the specific manufacturer would operate to artificially inflate the "starting point" price from which any such discounts would be calculated. This means that the actual price of the Archery Product that would be discounted in some way from the MAP pricing will still most likely be higher than the would-be competitive price of this Archery Product by the design of Defendants' anticompetitive conduct and/or conspiracy.

141. The ATA itself continued to encourage its members, both manufacturers and retailers alike (including Defendants), to adopt and strictly enforce the MAP policies set forth. The ATA largely contended that MAP policies ensure all retailers compete fairly and evenly on service instead of price.

142. As an ATA member, Kinsey's itself stated that "MAP policies exist to benefit both retailers and manufacturers by elevating perception of brand value, which leads to increased margins for retailers."

143. Defendants' conspiracy and/or agreement to fix prices within the Archery Industry has seen its intended effect through statements made by the ATA's members.

144. NABA, previously holding seats on the ATA Board of Directors, stated that its members strive for a minimum of about 40% profit based on the manufacturer's MAP.

145. Upon information and belief, another retailer detailed the effects of the de-facto price floors by claiming that most "archery shops are in areas where bow pricing is highly competitive from shop to shop. We all want to get the sale, but fortunately manufacturers set MAP pricing on bows, which mostly prevents one shop from grossly undercutting another on pricing. That way, we all get a piece of the pie."

V.    **Defendants' Suppression of Competition through Their Exchange of Key Information**

146. Defendants' exchange of key information had the effect of harming competition within the Archery Products market. This information exchange eliminates competition by removing the veil between retailers on prices, supply, demand, inventory, and other

51

key factors which would normally force retailers to compete with one another for lower prices to make the sale, and ultimately results in higher prices paid by Plaintiff.

147. To assess the competitive effects of Defendants' unlawful and anticompetitive conduct, a relevant market must be defined. This market is defined as the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market also contains both a product facet (i.e., the product market) and a geographic facet (i.e., the geographic market). As outlined within the Class definitions, this case is concerned with the sale of Archery Products in the United States and its territories.

148. Here, there is only one product market for Archery Products at large. As alleged herein, the MAP policies that were created and enforced by Defendants applied to all items and price points of all Archery Products.

149. The relevant geographic market at issue here is the United States and its territories.

150. Defendants hold market power for all Archery Products. As alleged herein, Defendant Manufacturers are some of the most well-known brands throughout the entire geographic market, or the Archery Products industry as a whole. Further, Plaintiff describes the power Defendant Manufacturers consistently held over the ATA, while holding seats on the ATA Board of Directors and ATA Retail Council throughout the Class Periods, which only increased their influence over the Archery Product market.

52

151. Moreover, Defendant Retailers make up some of the largest sellers or suppliers of Archery Products in the entire geographic market. The conception of the conspiracy was in large part due to the appointment of Defendant Retailers Bass Pro Shops and Cabela's to the ATA's Board of Directors, causing the ATA President, Tom McAninch, to reflect on the "mega marts joining into our industry discussions" which "allowed our Board members to see that the box stores [i.e., Bass Pro Shops and Cabela's] shared in our future and, more important, were serious about contributing to the success of the archery and bowhunting industry." As alleged herein, Defendant Retailers also had power over the ATA, by consistently holding seats on the ATA's Board of Directors and ATA Retail Council throughout the Class Periods, which only increased their influence over the Archery Product market.

152. In analyzing the impact on Defendants' MAP agreement and exchange of key information to make such an agreement, it is important to understand that this agreement is made for identical products being sold by would-be competitors, Defendant Retailers, and made by Defendant Manufacturers. Thus, one of – if not the only – way these Defendant Retailers could compete for consumer sales is through price, which is the exact component that Defendants all sought to fix through their conspiracy. Defendants' enforcement of MAP policies eliminates competition within the Archery Products industry and the "race to the bottom" that would occur had Defendants allowed themselves to participate in a legal, competitive market with one another.

153. Moreover, competition is harmed when would-be competitors collude and exchange key information such as financials, pricing, inventory, and sales strategies. When these items are shared amongst would-be competitors, any incentive to lower the price out of uncertainty of what the next manufacturer, distributor, or retailer will offer is diminished.

154. Defendants' exchange of key information did, in fact, harm competition. Through the platform and tools created, including but not limited to ATA Connect and the ATA Retail Growth Interact Channel, the ATA encouraged sharing ideas and asking questions amongst Defendants, including buying patterns, profit margins, and what to charge for services. The ATA marketed these resources as ways to help address industry challenges, boost Defendants' bottom line, and promote archery and bowhunting.

155. Defendants then used this key information learned through the various resources offered by ATA to make the decision to create and enforce MAPs on the entire Archery Product market that they manufactured and supplied to consumers. Therefore, this knowledge eliminated any independent decision-making regarding the price and sales strategies offered by Defendants throughout the entire Archery Product market.

156. Defendants' exchange of key information through ATA channels, platforms, resources, events, Board of Directors, and Retail Council, allows Defendants to collectively monitor each entity's sales, pricing, inventory, and other key items to ensure MAP policies are followed and everyone is upholding the agreed-upon conspiracy.

54

157. Further, where Defendants follow MAP policies and only compete fairly on service instead of price, the value of the key information exchanged through the ATA becomes exponentially more valuable.

158. On January 23, 2016, an Archery Product retailer and/or consumer posted a response on the online forum, *Archery Talk*, under the "General Crossbow Discussion – MAP Pricing" column. This post was in response to one anonymous retailer expressing how MAP has, in his opinion, "always stifled free enterprise and [in my opinion] is an attempt to confuse consumers." In response, the Archery Product retailer and/or consumer stated:

> Every dealer I have ever talked to thinks everything in archery is overpriced today, just as I do! Today vertical bows are exceeding [$]1000 – [$]1500 on a regular basis, a dozen crossbow arrows are over $80 and can cost up to [$]250 if you want custom work, firenock arrows are over $600 a dozen, vertical arrows are exceeding $200 for hunting arrows, don[']t get me started on target arrows, X10 Pro Tours are over $400 for bare shafts, points can be around $300. The average pay hasn't moved much in years[.] [I]s archery overpriced, absolutely.

159. Defendants' conspiracy to raise prices of Archery Products through the adoption, implementation, and enforcement of the industry-wide MAP policies by exchanging key information continues today. The ATA continues to endorse and advocate for its members to develop a MAP policy, while also pushing for technology and software to track when such MAP policies are being violated. Thus, Defendants and their co-conspirators continue to express and signal to one another their continued commitment to the price-fixing agreement.

55

## STATUTE OF LIMITATIONS AND TOLLING

160. Generally, consumers are unaware of MAP strategies or how manufacturers, distributors, and/or retailers may set advertising and sales prices for each product offered. Consumers are equally unaware that as part of this MAP process, the Archery Industry has an entire association with over one thousand industry player members that facilitates the collusion of these members in an effort to raise prices that consumers pay.

161. Plaintiff had no actual or constructive knowledge of Defendants' anticompetitive scheme until, at the earliest, May 30, 2025, when the first class action complaint was filed against Manufacturers, Distributors, and Retailers, or the Archery Industry in *Santarlas v. Hoyt Archery, Inc., et al*, D. Utah 2:25-cv-00436-DAK. Before that, there was insufficient information available to Plaintiff to suggest that the Defendants had engaged in anticompetitive conduct to increase and maintain their Archery Product prices, and thus, he had no duty to inquire into the legality of the Defendants' conduct.

162. Moreover, even if Plaintiff had a duty to inquire before May 30, 2025, Plaintiff could not have discovered through the exercise of reasonable diligence the existence of Defendants' competitive scheme as alleged herein before that date.

163. Defendants' anticompetitive scheme was self-concealing in that Defendants did not allow consumers access to any insider data, insight, lessons, or other key information used to set MAP pricing and collude with other industry suppliers.

56

164. Plaintiff's and Class members' claims were tolled by the discovery rule, the continuing violations doctrine, and fraudulent concealment. Each purchase of an Archery Product subject to MAP pricing is a new overt act causing injury to Plaintiff and the Classes.

## CLASS ALLEGATIONS

165. Plaintiff brings Count I under Federal Rule of Civil Procedure 23(a) and (b)(2), as representative of a Class of Archery Product consumers seeking injunctive relief ("Nationwide Injunctive Relief Class") defined as:

> All persons and entities residing in the United States or its territories who purchased Archery Products (defined herein) directly from the named Defendants, any Archery Trade Association member, or any of their co-conspirators at any time between January 1, 2014, and the present (the "Class Period").[6]

166. Plaintiff brings Count II under Federal Rule of Civil Procedure 23(a), (b)(3), and/or (c)(5) as representative of a Class of Archery Product consumers seeking damages ("Nationwide Damages Class") defined as:

> All persons and entities residing in the United States or its territories who purchased Archery Products (defined herein) directly from the named Defendants, any Archery Trade Association member, or any of their co-conspirators at any time between January 1, 2014, and the present (the "Class Period").

---

[6] Excluded from each of the Classes are all named Defendants, their subsidiaries and affiliates, officers, executives, and employees; the Defendants' attorneys in this case; federal government entities and instrumentalities, states or other subdivisions; counsel for Plaintiff and any of their immediate family members; and all judges assigned to this case and any of their immediate family members or members of their respective staffs.

57

167. **Numerosity.** The Classes are so numerous that joinder of all members would be impracticable. While the exact number of Class members is unknown, given the large Archery Industry at issue and the widespread trade and commerce involved, there are most likely hundreds of thousands of Class members.

168. **Typicality.** Plaintiff's claims are typical of those of the Classes in that he purchased Archery Products subject to a MAP.

169. **Adequacy.** Plaintiff will fairly and adequately protect and represent the interests of the Classes and has no known conflicts with other Class members. Plaintiff's interests are in accord with those of the Classes. Further, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

170. **Commonality.** Questions of law and fact common to the Classes will prevail over questions, should they arise, that may be specific to individual Class members because Defendants have acted on grounds generally applicable to the Classes.

171. Questions of law and fact common to the Classes include, but are not limited to:

   a. Whether Defendants and co-conspirators intentionally and unlawfully impaired or impeded competition in the relevant market;

   b. Whether Defendants and co-conspirators engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States;

58

c.  Whether Defendants' and co-conspirators' conduct caused the prices of Archery Products sold in the United States to be sold at artificially high and supracompetitive levels;

d.  Whether the Plaintiff and other members of the Classes were injured by Defendants' and co-conspirators' conduct, and, if so, the appropriate class-wide measure of damages for Class members;

e.  The scope of any injunctive relief to which Plaintiff and the other members of the Classes are entitled; and

f.  The proper measure of damages.

172. **Superiority.** Class action treatment is superior to individual actions and the fair and efficient adjudication of the controversy because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the need for unnecessary duplicative efforts and expenses. The benefits of proceeding as a class action, including providing injured persons with a method for obtaining relief for claims that might not be practicable to pursue individually substantially outweighs any difficulties that may arise in connection with managing this class action.

173. Plaintiff knows of no difficulty to be encountered in the maintenance of this action as a class action.

CAUSES OF ACTION

COUNT I:
VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3
VIOLATIONS OF THE CLAYTON ACT, 15 U.S.C. §§ 15(A), 26
(on behalf of the Nationwide Injunctive and Damages Classes)

174. Plaintiff incorporates each prior paragraph as if set forth herein.

175. Beginning as early as January 1, 2014, and continuing to the present, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Products in the United States to supracompetitive levels in violation of Sections 1 and 3 of the Sherman Act.

176. Defendants and their co-conspirators agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

177. Defendants' exchange of information has had the intended anticompetitive effects, including but not limited to: (1) raising, fixing, maintaining, or stabilizing prices of Archery Products at an artificially high level; and (2) eliminating or suppressing, to a substantial degree, competition among the Defendant Manufacturers and/or Retailers for sales of Archery Products in the relevant geographic market of the United States.

178. Each named Defendant and co-conspirator has participated in one or more overt acts on information and belief in furtherance of the exchange of information.

179. Defendants' conduct is unlawful under the per se standard, while also being unlawful under the rule of reason analysis. Defendants' agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

180. As a direct and proximate result of Defendants' contract, combination, and/or conspiracy alleged herein, the following effects have occurred, among others:

a. Price competition has been restrained, suppressed and/or eliminated within the United States for the sale of Archery Products;

b. Prices for Archery Products sold by Defendant Manufacturers and/or Retailers have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

c. Those who purchased Archery Products directly from Defendant Manufacturers and/or Retailers, or their co-conspirators, have been deprived of the benefits of free and open competition.

181. Plaintiff and Class members have been injured and will continue to be injured in their businesses and property by paying more for Archery Products purchased from Defendant Manufacturers and/or Retailers or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

61

182. Plaintiff and Class members seek three times their damages caused by Defendants' violations under Sections 1 and 3 of the Sherman Act, reasonable attorneys' fees and costs, and a permanent injunction enjoining Defendants from ever entering into similar or the same agreements in the future by and through Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

### PRAYER FOR RELIEF

183. Plaintiff requests judgment including the following relief:

1. That the Court enter an order declaring that Defendants' action, as set forth in this Complaint, violates the federal laws set forth above;

2. That the Court award damages, treble and multiple damages, interest, punitive damages, and/or restitution in an amount to be determined at trial;

3. That the Court issue appropriate injunctive and other equitable relief against Defendants;

4. That the Court award Plaintiff and the Classes pre- and post-judgment interest;

5. That the Court award Plaintiff the costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and

6. That the Court award any and all such other relief as the Court may deem just and proper.

### JURY DEMAND

184. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all matters so triable.

Dated: July 15, 2025                          Respectfully submitted,

                                              **PAUL LLP**
                                              _/s/ Richard M. Paul III_
                                              Richard M. Paul III, MO Bar # 44233
                                              Ashlea G. Schwarz, MO Bar # 60102
                                              David Bodenheimer, MO Bar # 74580
                                              Megan M. Duffield, MO Bar # 76886
                                              600 Broadway Boulevard, Suite 600
                                              Kansas City, Missouri 64105
                                              Telephone: (816) 984-8100
                                              Facsimile: (816) 984-8101
                                              Rick@PaulLLP.com
                                              Ashlea@PaulLLP.com
                                              David@PaulLLP.com
                                              Megan@PaulLLP.com

**ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASSES**