# EXHIBIT G

# U.S. District Court
## Western District of Pennsylvania (Pittsburgh)
### CIVIL DOCKET FOR CASE #: 2:25-cv-01004-MJH

BUTTER v. ARCHERY TRADE ASSOCIATION, INC. et al
Assigned to: Judge Marilyn J. Horan
Cause: 15:1 Antitrust Litigation

Date Filed: 07/17/2025
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

### Plaintiff

**SHAWN BUTTER**
*on behalf of himself and all others similarly situated,*

represented by **D. Aaron Rihn**
Robert Peirce & Associates, P.C.
707 Grant Street
Suite 125
Pittsburgh, PA 15219
412-281-7229
Fax: 412-281-4229
Email: arihn@peircelaw.com
*ATTORNEY TO BE NOTICED*

**Sara J. Watkins**
Robert Peirce & Associates, P.C.
437 Grant Street
Suite 1100
Pittsburgh, PA 15219
412-281-7229
Fax: 412-281-4229
Email: swatkins@peircelaw.com
*ATTORNEY TO BE NOTICED*

**Kelly K. Iverson**
Lynch Carpenter, LLP
1133 Penn Avenue
5th Floor
Pittsburgh, PA 15222
412-322-9243
Email: kelly@lcllp.com
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**ARCHERY TRADE ASSOCIATION, INC.**

### Defendant

**BOWTECH INC.**

### Defendant

**BPS DIRECT, LLC**
*doing business as*

BASS PRO SHOPS

**Defendant**

**CABELA'S LLC**

**Defendant**

**DICK'S SPORTING GOODS, INC.**

**Defendant**

**HOYT ARCHERY, INC.**

**Defendant**

**JAY'S SPORTS INC.**
*doing business as*
**JAY'S SPORTING GOODS**

**Defendant**

**KINSEY'S OUTDOORS, INC.**

**Defendant**

**LANCASTER ARCHERY SUPPLY, INC.**

**Defendant**

**MATHEWS ARCHERY, INC.**

**Defendant**

**NEUINTEL LLC**
*doing business as*
**PRICESPIDER**
*formerly known as*
**ORIS INTELLIGENCE**

**Defendant**

**PRECISION SHOOTING EQUIPMENT, INC.**

**Defendant**

**TRACKSTREET, INC.**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/17/2025 | 1 | COMPLAINT against ARCHERY TRADE ASSOCIATION, INC., BOWTECH INC., BPS DIRECT, LLC, CABELA'S LLC, DICK'S SPORTING GOODS, INC., HOYT ARCHERY, INC., JAY'S SPORTS INC., KINSEY'S OUTDOORS, INC., LANCASTER ARCHERY SUPPLY, INC., MATHEWS ARCHERY, INC., NEUINTEL LLC, PRECISION SHOOTING EQUIPMENT, INC., TRACKSTREET, INC. (Filing fee, including Administrative fee, $405, receipt number APAWDC-8978370), filed by SHAWN BUTTER. (Attachments: # 1 Civil Cover Sheet, # 2 Summons: Archery Trade Association, Inc., # 3 Summons: BowTech, Inc., # 4 Summons: BPS Direct, LLC, # 5 Summons: Cabela's LLC, # 6 Summons: Dick's Sporting Goods, Inc., # 7 Summons: Hoyt Archery, Inc., # 8 Summons: Jay's Sports, Inc., # 9 Summons: Kinsey's Outdoors, Inc., # 10 Summons: Lancaster Archery Supply, Inc., # 11 Summons: Mathews Archery, Inc., # 12 Summons: Neuintel, LLC, # 13 |

| | | |
|---|---|---|
| | | Summons: Precision Shooting Equipment, Inc., # 14 Summons: TrackStreet, Inc.) (Iverson, Kelly) (Entered: 07/17/2025) |
| 07/18/2025 | | Judge Marilyn J. Horan added. (kss) (Entered: 07/18/2025) |
| 07/18/2025 | 2 | Summons Issued as to ARCHERY TRADE ASSOCIATION, INC., BOWTECH INC., BPS DIRECT, LLC, CABELA'S LLC, DICK'S SPORTING GOODS, INC., HOYT ARCHERY, INC., JAY'S SPORTS INC., KINSEY'S OUTDOORS, INC., LANCASTER ARCHERY SUPPLY, INC., MATHEWS ARCHERY, INC., NEUINTEL LLC, PRECISION SHOOTING EQUIPMENT, INC., TRACKSTREET, INC. (Attachments: # 1 Summons BowTech, Inc., # 2 Summons BPS Direct, LLC, # 3 Summons Cabela's LLC, # 4 Summons Dick's Sporting Goods, Inc., # 5 Summons Hoyt Archery, Inc., # 6 Summons Jay's Sports, Inc., # 7 Summons Kinsey's Outdoors, Inc., # 8 Summons Lancaster Archery Supply, Inc., # 9 Summons Mathews Archery, Inc., # 10 Summons Neuintel LLC, # 11 Summons Precision Shooting Equipment Inc., # 12 Summons TrackStreet, Inc.) (kss) (Entered: 07/18/2025) |
| 07/21/2025 | 3 | NOTICE of Appearance by D. Aaron Rihn on behalf of SHAWN BUTTER. (Rihn, D.) (Entered: 07/21/2025) |
| 07/21/2025 | 4 | NOTICE of Appearance by Sara J. Watkins on behalf of SHAWN BUTTER. (Watkins, Sara) (Entered: 07/21/2025) |

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN BUTTER, on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>ARCHERY TRADE ASSOCIATION, INC.; BOWTECH INC.; BPS DIRECT, LLC d/b/a BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; HOYT ARCHERY, INC.; JAY'S SPORTS INC. d/b/a JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; MATHEWS ARCHERY, INC.; NEUINTEL LLC d/b/a PRICESPIDER f/k/a ORIS INTELLIGENCE; PRECISION SHOOTING EQUIPMENT, INC.; TRACKSTREET, INC.,<br><br>     Defendants. | Case No: 2:25-cv-01004<br><br><br>**COMPLAINT-CLASS ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 1

II. JURISDICTION AND VENUE .................................................................................. 7

III. PARTIES .................................................................................................................... 9

  A. Plaintiff ................................................................................................................. 9

  B. Defendants ............................................................................................................ 9

     1. Trade Association Defendant ........................................................................ 9

     2. Manufacturer Defendants ........................................................................... 10

     3. Retailer Defendants .................................................................................... 11

     4. Software Defendants ................................................................................... 13

IV. AGENTS AND CO-CONSPIRATORS ................................................................... 14

V. FACTUAL ALLEGATIONS ..................................................................................... 14

  A. The Relevant Market for Archery Products ........................................................ 14

  B. The ATA's Communication Channels Allow for Effective Coordination ............... 17

     1. The ATA Board ........................................................................................... 18

     2. The ATA Retail Council .............................................................................. 19

     3. ATA Trade Shows ....................................................................................... 20

     4. ATA Connect ............................................................................................... 20

     5. The ATA Retail Business Tracker Survey .................................................. 21

  C. Defendants' Agreement to Adopt and Enforce MAP Policies in Order to Establish Supracompetitive Prices for Archery Products ...................................... 22

     1. The ADA Begins Encouraging Manufacturers and Retailers to Adopt and Enforce MAP Policies ......................................................................... 22

     2. The Expanded Influence of Retailers Within the ATA Leads to the Formation of the Cartel and the Expanded Promotion and Enforcement of MAPs ...................................................................................................... 28

     3. The ATA Begins Working with Co-Conspirators to Offer Retailers and Manufacturers Expanded Means to Enforce MAP Policies ......................... 29

  D. Defendants' Agreement to Exchange Competitively Sensitive Information in Order to Raise Prices to a Supracompetitive Level ............................................. 36

  E. Defendants' Scheme Has Caused Anticompetitive Effects .................................... 39

VI. IMPACT ON INTERSTATE TRADE AND COMMERCE .................................... 41

VII. ANTITRUST INJURY ........................................................................................... 42

VIII. TOLLING OF THE STATUTE OF LIMITATIONS ............................................. 44

A. Fraudulent Concealment ............................................................................... 44

B. Continuing Violation ..................................................................................... 45

**IX. CLASS ACTION ALLEGATIONS** ........................................................... 46

**X. CLAIMS FOR RELIEF** ............................................................................... 50

**XI. PRAYER FOR RELIEF** ............................................................................. 53

**XII. JURY TRIAL DEMANDED** ..................................................................... 54

Plaintiff Shawn Butter ("Plaintiff") brings this action individually and on behalf of all other similarly situated direct purchasers against Defendants (as defined in ¶ 2) for violations of federal antitrust laws. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws for the anticompetitive conduct alleged herein and demands a trial by jury on all matters so triable. In support of this Complaint, Plaintiff alleges as follows based upon personal knowledge as to the facts pertaining to himself and upon information and belief and investigation of counsel as to all other matters.

## I.      INTRODUCTION

1.      This action arises from Defendants' (as defined in ¶ 2) conspiracy to fix, raise, maintain, and/or stabilize the price of Archery Products (which includes bows, arrows, arrowpoints, targets, and accessories and which is defined more fully below, *infra* ¶ 48).

2.      The Defendants in this action consist of: (a) manufacturers of Archery Products, namely Bowtech Inc. ("Bowtech"), Hoyt Archery, Inc. ("Hoyt"), Mathews Archery, Inc. ("Mathews"), and Precision Shooting Equipment, Inc. ("PSE") (collectively, the "Manufacturer Defendants"); (b) sporting goods retailers, which market and sell Archery Products, namely BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops"), Cabela's LLC ("Cabela's"), DICK'S Sporting Goods, Inc. ("Dick's Sporting Goods"), Jay's Sporting Goods, Inc. d/b/a Jay's Sporting Goods ("Jay's Sporting Goods"), Kinsey's Outdoors, Inc. ("Kinsey's"), and Lancaster Archery Supply, Inc. ("Lancaster Archery Supply") (collectively, the "Retailer Defendants"); (c) technology companies which generate, market, and sell pricing software used in relation to Archery Products, namely TrackStreet, Inc. ("TrackStreet") and NeuIntel LLC, d/b/a PriceSpider f/k/a Oris Intelligence ("Oris") (together, the "Software Defendants"); and (d) the ATA, which is an industry trade association whose membership encompasses the majority of manufacturers,

1

distributors, and retailers of Archery Products. Collectively, the Manufacturer Defendants, the Retailer Defendants, the Software Defendants, and the ATA are referred to herein as "Defendants."

3. The products at issue are not a novel invention, but one of humanity's most ancient technologies. Remains of bows and arrows which utilize the same basic structure as those used today have been found across every continent, sometimes in forms which are 11,000 years old.

4. Of course, today's Archery Products are more engineered. Compound bows involve multiple systems of cables and pulleys to maximize the energy and speed of each shot. Broadhead arrowheads are composed of multiple blades and carbon steel. Arrows feature micro-diameter design to minimize wind drift and maximize energy transfer.

5. These products are all used in bow sports, a large and growing form of outdoor recreation. In 2020, an ATA survey estimated that there were some 9.9 million bowhunters, 17.6 million recreational archers, and 5.4 million competitive archers nationwide.

6. Even the United States government subsidizes the growth of archery. Since 2002, the National Archery in Schools Program has engaged over 1.3 million students in over 9,500 schools in the sport. These students have experienced positive effects. A 2024 survey indicated that some 37% of these students participated in other outdoor activities following these programs.

7. Perhaps the only thing slowing down the growth of archery: prohibitively high prices for Archery Products. The website www.sportsmancrew.com estimates the prices of a quality bow set at $500-1,000, plus another $150-$300 minimum for arrows and arrowhead tips. Such costs do not include necessary accessories, such as arrow quivers or targets.

8. Unfortunately for American consumers, from at least January 1, 2014 until the present, these prices have not been set by the economic forces of supply and demand. Instead, prices for Archery Products have been artificially increased through an agreement among all Defendants, and their co-conspirators, to artificially fix, raise, maintain, or stabilize retail prices for Archery Products.

9. These entities implemented their conspiracy through their common membership in the ATA. Since 2014, the ATA, a professional association which includes the most prominent and influential Archery Product manufacturers, distributors, and retailers across the United States, has worked with Defendants and their co-conspirators to artificially increase prices for Archery Products at the retail level through the widespread adoption, implementation, and enforcement of minimum advertised price ("MAP") policies.

10. MAP policies impose a floor on the price at which retailers can advertise a product for sale. MAP policies require widespread adoption and enforcement by horizontal competitors to have a sustained effect on prices. Otherwise, individual manufacturers and retailers retain strong incentives to disregard the policies and win market share.

11. However, once an illegal cartel is formed, MAP policies can be an effective tool to carry out a price-fixing conspiracy. Economist John Asker has noted that MAP policies can:

> raise[] cartel profits and stability by allowing manufacturers to more easily monitor each other's behavior. Notably, this process is done without sacrificing the ability of cartel members to tailor actual transaction prices to local market conditions. That is . . . MAP may be viewed as analogous to a market division scheme.

12. Beginning in 2014, Defendants and their co-conspirators began to organize and facilitate just such a cartel, collectively agreeing to adopt, promote, and enforce MAP policies throughout the industry in order to fix, increase, or stabilize the retail price of Archery Products. The ATA played a central role in this scheme by actively encouraging, and financially

3

incentivizing, its member retailers, manufacturers, and distributors to adopt and enforce these policies.

13.     On December 31, 2014, the then President and CEO of ATA, Jay McAninch ("McAninch"), under pressure from large retailers with increasing influence within the organization, published a blog post encouraging more industry participants to consider MAP policies, under the signaling headline: "Together We Stand; Divided We Fall." In the article, McAninch wrote: "In the months ahead, [the ATA will] facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP . . . We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action . . . "

14.     Over the next several years, the ATA began to take more concerted steps to eliminate price competition by promulgating and enforcing MAP policies throughout the Archery Product industry. In January 2015, McAninch invited representatives from ATA member manufacturers, distributors, and retailers to review a sample MAP policy at an industry trade show, explaining that "companies can use the sample policy as a starting point in crafting customized policies to protect each product's publicly advertised minimum price."

15.     The ATA began to disseminate articles, social media posts, and other industry outreach to display how horizontal competitors could coordinate on the enforcement of MAP policies, and the maintenance of artificially high prices. ATA articles relayed that "The ATA and its member companies have worked tirelessly to discuss, craft, and enforce MAP policies that could help manufacturers, retailers, and the industry." Industry participants agreed, stating that the "ATA has done an excellent job of getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts and sample policies . . . If you have a [MAP],

4

it must be enforced." One manufacturer recounted how McAninch personally spoke with him about creating a MAP policy and connected him with resources to enforce it.

16.     Throughout these posts, ATA representatives stressed the need for retailers and manufacturers to join the organization's cartel and collaborate to ensure that prices remained above competitive levels. For example, in 2017, the ATA told its retail members, "If a manufacturer doesn't have a policy, or doesn't enforce its policy, call the company and express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy."

17.     In that same year, the ATA stepped up its efforts to ensure the enforcement of MAP policies. First, the ATA launched a "MAP Resource Library" to help "retailers learn which manufacturers have MAP policies, and [help] retailers to understand and comply with them." Next, the ATA began offering its members discounted access to online pricing tools sold by Software Defendants. These tools detected MAP violators and took enforcement actions against them to ensure that, following the violation of a manufacturer's MAP policy, they could not receive any Archery Products from that manufacturer in the future.

18.     In 2019, Kurt Smith, then the ATA's Director of Industry Relations, made doubly clear that the ATA's retailers and manufacturers should coordinate enforcement actions: "MAP policies require vigilant enforcement, which means good communications between manufacturers, distributors and retailers . . . Companies can set their policies and clean up the worst MAP violations, but their job is never really done . . . That's why it's so important for ATA members to work together as much as possible."

19.     Other industry participants, including certain Defendants and co-conspirators, followed these hints and joined the ATA's conspiracy to raise prices through the coordinated

5

adoption and enforcement of MAP policies. For example, in 2015, Kinsey's, a major Archery Product distributor, announced that it would adopt MAP policies and work with manufacturers to enforce them: "MAP policies exist to benefit both retailers and manufacturers by elevating perception of brand value, which leads to increased margins for retailers." MAP policies were openly discussed by industry participants at ATA trade shows, where manufacturers proudly displayed their strict MAP policies at their booth.

20.     Since 2021, when it began to face antitrust scrutiny, the ATA has shirked away from its open endorsement of MAP policies, deleting a number of articles relating to MAP policies from its website. Yet Defendants' conspiracy continues. The ATA continues to offer discounts on MAP software sold by Software Defendants for ATA members and still encourages both manufacturers and retailers to adopt MAP policies. Defendant Retailers, Defendant Manufacturers, and their co-conspirators continue to use and enforce their MAPs. Other participants in the industry continue to emphasize that they "police MAP 24/7."

21.     In addition to this agreement to increase prices through the adoption and enforcement of MAP policies, the ATA has facilitated and encouraged its members to share competitively sensitive information using private information channels. Throughout the late 2010s, the ATA implemented a number of communication channels for its members to use to exchange competitively sensitive information. For example, in 2018, the ATA rolled out Retail Growth Interact, a messaging service which allowed retailers to "share ideas and ask questions about the topics that matter most to your business, including buying patter[n]s, profit margins and what to charge for services."

6

22. In 2022, the ATA began offering a members-only survey to retailers which asked granular questions regarding price ranges and local market conditions. This information was circulated exclusively to ATA members, many of which engage in horizontal competition.

23. In taking the aforementioned steps and those described herein, the ATA, in conjunction with Defendant Manufacturers, Defendant Retailers, Software Defendants, and their co-conspirators, have engaged in a conspiracy or agreement to artificially fix, raise, maintain or stabilize the retail price of Archery Products, which is a *per se* unlawful agreement to restrain price competition under the federal antitrust laws. Consumers of Archery Products have been forced to pay artificially high prices as a result.

## II.     JURISDICTION AND VENUE

24. Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to (i) recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; (ii) enjoin Defendants' anticompetitive conduct; and (iii) for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

25. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

26. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce

described herein was carried out in this District. For example, Defendant Dick's Sporting Goods maintains its corporate headquarters in Coraopolis, Pennsylvania.

27.     Venue is also proper in this District due to the particularly high number of Archery Product consumers within this District. In 2023, the ATA estimated that Pennsylvania contained the nation's highest number of licensed bowhunters, at some 331,000 bowhunters.

28.     This Court has personal jurisdiction over each Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and the long-arm statute of Pennsylvania, 42 Pa. Consol. Stat. Ann. § 5322, because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Archery Products to individuals throughout the United States, including in this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District. Each Defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum contacts therein because each Defendant committed intentional acts that were intended to cause and did cause injury within the United States.

29.     The activities of Defendants and all co-conspirators as described herein, were within the flow of, intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

30.     No other forum would be more convenient for the parties and witnesses to litigate this case.

8

### III.   PARTIES

#### A. Plaintiff

31.     Plaintiff Shawn Butter is a resident of Pennsylvania. Within the Class Period, Plaintiff purchased one or more Archery Products which were manufactured by one of the Manufacturer Defendants and sold by one of the Manufacturer Defendants or Retailer Defendants. The Archery Products that Plaintiff purchased were sold at artificially inflated prices due to Defendants' unlawful conduct alleged herein. Plaintiff has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

#### B. Defendants

32.     Each Defendant named herein acted as the agent of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

33.     Whenever reference is made to the act of any corporate Defendant listed below, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

##### 1.   Trade Association Defendant

34.     Defendant ATA is a Virginia corporation with its primary place of business at 117 South Valley, New Ulm, Minnesota. The ATA is a members-only trade association which works to further the economic interests of firms involved in the manufacture, distribution, and sale of Archery Products. Throughout the Class Period, the ATA participated in a conspiracy, contract, or agreement to fix, raise, maintain, or stabilize the prices of Archery Products sold within the United States at artificially high levels. The ATA also, in furtherance of the above conspiracy, facilitated and encouraged the exchange of competitively sensitive information between and

9

among the Manufacturer Defendants and the Retailer Defendants, including, though not limited to, information on prices, capacity, demand, sales volume, future sales strategy, and strategic planning.

### 2. Manufacturer Defendants

35. Defendant Hoyt Archery, Inc. is a Utah corporation with its primary place of business at 593 N Wright Brothers Drive, Salt Lake City, Utah. Throughout the Class Period, Hoyt was a member of the ATA with a representative on its Board of Directors, produced and sold Archery Products subject to a MAP, and participated in a conspiracy, contract, or agreement to fix, raise, maintain, or stabilize the prices of Archery Products sold within the United States at artificially high levels.

36. Defendant Bowtech Inc. is a Delaware corporation with its primary place of business at 90554 Highway 99 N., Eugene Oregon. Throughout the Class Period, Bowtech was a member of the ATA with a representative on its Board of Directors, produced and sold Archery Products subject to a MAP, and participated in a conspiracy, contract, or agreement to fix, raise, maintain or stabilize the prices of Archery Products sold within the United States at artificially high levels.

37. Defendant Mathews Archery, Inc. is a Wisconsin corporation with its primary place of business at 919 River Road, Sparta, Wisconsin. Throughout the Class Period, Mathews was a member of the ATA with a representative on its Board of Directors, produced and sold Archery Products subject to a MAP, and participated in a conspiracy, contract, or agreement to fix, raise, maintain, or stabilize the prices of Archery Products sold within the United States at artificially high levels.

38.     Defendant Precision Shooting Equipment is a Delaware corporation with its primary place of business at 2727 North Fairview Avenue, Tucson, Arizona. Throughout the Class Period, PSE was a member of the ATA with a representative on its Board of Directors, produced and sold Archery Products subject to a MAP, and participated in a conspiracy, contract or agreement to fix, raise, maintain or stabilize the prices of Archery Products sold within the United States at artificially high levels.

### 3.  Retailer Defendants

39.     Defendant Cabela's LLC was a Delaware limited liability company with its primary place of business at 1 Cabela Drive, Sidney, Nebraska. Cabela's has 171 retail stores throughout the United States and operates an online storefront. In 2017, Cabela's was acquired by Bass Pro Shops. Until 2017, and within the Class Period, Cabela's was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and participated in a conspiracy, contract or agreement to fix, raise, maintain or stabilize the prices of Archery Products sold within the United States at artificially high levels.

40.     Defendant DICK'S Sporting Goods, Inc. is a Delaware corporation with its primary place of business at 345 Court Street, Coraopolis, Pennsylvania. Dick's Sporting Goods has 728 retail stores throughout the United States and operates an online storefront. Throughout the relevant period, Dick's Sporting Goods was a member of the ATA, sold Archery Products subject to a MAP, and participated in a conspiracy, contract or agreement to fix, raise, maintain or stabilize the price of Archery Products sold within the United States at artificially high levels.

41.     Defendant BPS Direct, LLC, d/b/a Bass Pro Shops is a Delaware corporation with its primary place of business at 3500 E. Kearney Street, Springfield, Missouri. Bass Pro Shops has approximately 200 retail stores throughout the United States and operates an online storefront.

Throughout the relevant period, Bass Pro Shops was a member of the ATA, sold Archery Products subject to a MAP, and participated in a conspiracy, contract or agreement to fix, raise, maintain or stabilize the price of Archery Products sold within the United States at artificially high levels.

42. Defendant Jay's Sports, Inc. d/b/a. Jay's Sporting Goods is a Michigan corporation with its primary place of business at 8800 S. Clare Avenue, Clare, Michigan. Jay's Sporting Goods has two retail locations and operates an online storefront. Throughout the relevant period, Jay's Sporting Goods was a member of the ATA with a representative on its Board of Directors, sold Archery Products subject to a MAP, and participated in a conspiracy, contract or agreement to fix, raise, maintain, or stabilize the price of Archery Products sold within the United States at artificially high levels.

43. Defendant Kinsey's Outdoors, Inc. is a Pennsylvania corporation with its primary place of business at 1660 Steelway Drive, Mount Joy, Pennsylvania. Kinsey's is a distributor of outdoor goods, including Archery Products, to more than 4,600 retailers across the United States, in addition to its own retail location. Kinsey's also operates an online storefront. Throughout the relevant period, Kinsey's was a member of the ATA with a representative on its Board of Directors, sold Archery Products subject to a MAP, and participated in a conspiracy, contract or agreement to fix, raise, maintain, or stabilize the price of Archery Products sold within the United States at artificially high levels.

44. Defendant Lancaster Archery Supply, Inc. is a Pennsylvania corporation with its primary place of business at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. Lancaster Archery Supply describes itself as a "leading worldwide archery distributor," and has its own retail location and online storefront. Throughout the relevant period, Lancaster Archery Supply

12

was a member of the ATA with a representative on its Board of Directors, sold Archery Products subject to a MAP, and participated in a conspiracy, contract or agreement to fix, raise, maintain, or stabilize the price of Archery Products sold within the United States at artificially high levels.

### 4. Software Defendants

45. Defendant TrackStreet, Inc. is a Delaware corporation with its primary place of business at 9811 W Charleston Boulevard, Suite 2-776, Las Vegas, Nevada. TrackStreet helps its clients generate pricing policies, including MAP policies. TrackStreet also provides firms with software to enforce those pricing policies. TrackStreet has advertised itself as offering "MAP monitoring software to track your products' online presence and enforce your policy against violators." Within the Class Period, TrackStreet knowingly assisted Defendants and their co-conspirators in establishing and enforcing their MAP policies and, in doing so, assisted in a conspiracy, contract, or agreement to fix, raise, maintain, or stabilize the price of Archery Products sold within the United States at artificially high levels.

46. Defendant NeuIntel LLC, d/b/a PriceSpider, f/k/a Oris Intelligence is a California corporation with its primary place of business at 20 Pacifica, Suite 1000, Irvine, California. Oris helps its clients generate pricing policies, including MAP policies. Oris also provides firms with software to enforce those pricing policies. Oris advertises its MAP monitoring software, Prowl, as helping to ensure "that [MAP] violators will never slip through the cracks." Within the Class Period, Oris knowingly assisted Defendants and their co-conspirators in establishing and enforcing their MAP policies and, in doing so, assisted in a conspiracy, contract, or agreement to fix, raise, maintain, or stabilize the price of Archery Products sold within the United States at artificially high levels.

## IV.    AGENTS AND CO-CONSPIRATORS

47.    Various other persons, firms, and corporations not named as Defendants engaged in the conspiracy to fix, raise, maintain, or stabilize the price of Archery Products, and have participated as co-conspirators with Defendants. These co-conspirators performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of these co-conspirators whether they are named as Defendants in this Complaint.

## V.    FACTUAL ALLEGATIONS

### A.  The Relevant Market for Archery Products

48.    "Archery Products" as that term is used herein includes all products used by consumers engaged in recreational archery, competitive archery and bowhunting. The Archery Products market encompasses, but is not limited to, the following main product markets, submarkets, or cluster markets:

(1) bows, such as compound bows, recurve bows, longbows, bowfishing bows, and crossbows, and their associated components;

(2) arrows, crossbow bolts, and their associated components, such as the shaft, fletching, and nock, with the exception of arrowheads;

(3) arrowheads and arrowpoints, such as broadheads and field points;

(4) targets, such as bag, foam, and 3D targets; and

(5) archery accessories, such as bow cases, arrow quivers, sights, scopes, and stabilizers.



*Figure 1: Compound Bow*



*Figure 2: Broadhead Arrowhead*



*Figure 3: Easton x10 Parallel Pro Arrows*

*Figure 4:Rinehart 1/3 Scale Elk 3D Target*

49. The U.S. market for Archery Products is substantial, with an estimated size of over $1.2 billion in 2024, and further growth forecasted. A 2020 estimate by the ATA found that there were some 9.9 million bowhunters, 17.6 million recreational archers, and 5.4 million competitive archers above the age of fifteen.

15

50. Even the United States government subsidizes the growth of archery. Since 2002, the National Archery in Schools Program has engaged over 1.3 million students in over 9,500 schools in the sport of archery.

51. This growth in the market for Archery Products is affected, however, by their prohibitively high prices for consumers. Even relatively simple bows average between $150 to $300, while highly engineered compound bows cost anywhere from $400 for budget models, all the way to $1,700 at the high end. Per an internal review of Archery Products sold at www.cabelas.com, standard arrows without heads average above $50 per set, with premium models costing up to $200. Arrowheads sold on the same website retail at $39.99 for a pack of three. 3D archery targets average well above $100, with premium models, again, reaching a price range of between $350 and $400.

52. The relevant geographic market for all claims is the United States. Defendants' conspiracy impacted the price of Archery Products sold across the United States and consumers across the United States. Therefore, it is appropriate to analyze the competitive effects of Defendants' MAP policies across the United States as a whole. Doing so is also efficient, as it allows for an analysis of the overall competitive effects of the MAP policy which does not account for any potential analytical differences within different submarkets.

53. Defendants and their co-conspirators have, at all relevant times, possessed market power at every level of the United States market for Archery Products, including the manufacturing, distribution, and retail sales level. They therefore had the ability to impose a significant, non-transitory increase in price to above competitive levels without losing a commensurate number of sales. Given this level of market power, consumers are unable to shift to other companies or products to defeat artificial price increases.

54. Consumers are also unlikely to shift to other products due to the unique value proposition which bow sports provide. Posts from bowhunters on *Archery Talk* relay the heightened level of enjoyment which bowhunters receive from bowhunting as opposed to other methods of hunting, such as the use of firearms:

- DJO: "I have always been more partial to bowhunting but would gun hunt each year until recently. I do not get the same enjoyment hunting with a rifle/shotgun and now hunt with a bow straight through gun season. As this season winds down, I realized that I have not stepped foot in the woods with a rifle over the past three seasons. Anybody else move exclusively to bowhunting?"

- ParkerBow: "Going shotgun next week for the first time in about 10+ years . . . I don't find gun hunting as exciting so I rarely go."

- slowen: "[sic] in California I apply for the AO (archery only) tag which allows me to hunt most of the state from July through November. I gave up gun deer hunting 30 years ago… no regrets"

- Kessick: "Same here. No interest in rifle hunting once I got my first deer with a bow."

- 1canvas: "I seldom find myself in the woods gun season, I probably haven't been gun hunting since 2017. This year I tried to rekindle some desire with a new pistol and went a couple of days but it just isn't there. I just sold that pistol a couple of weeks ago. Actually, I had went a different direction into recurves."

**B. The ATA's Communication Channels Allow for Effective Coordination**

55. The ATA is a trade association representing manufacturers, retailers, distributors, and others engaged in the Archery Products industry. The ATA's website offers several membership categories including, though not limited to, "Retailers & Ranges," "Manufacturers &

Distributors," and "Sales Representative[s]." Applications for membership require a set of verification documents and are subject to review by ATA staff.

56. The ATA offers significant benefits to those who join. Membership allows one to attend the "ATA Show," an annual trade show centered on the archery and bowhunting industries, participate in ATA Connect, an exclusive online discussion forum, and gain access to a Member Directory. In addition, beginning in 2022, membership in the ATA allowed members to gain access to the annually updated Retail Business Tracker Survey, which provides self-reported, granular information on a range of competitively sensitive information, including seasonal sales numbers, price ranges, and percentages of sales by product type.

57. The ATA's member-exclusive events, online communication channels, and resources described herein, along with the ATA Board of Directors and ATA Retail Council, provided Defendants and their co-conspirators with the opportunities necessary to generate and execute an effective conspiracy.

58. Defendants and their co-conspirators therefore had the opportunity to and did form a conspiracy and, in furtherance of that conspiracy, knowingly promulgated anticompetitive rules, guidelines, and procedures related to MAP policies, with the express purpose of restraining competition for Archery Products sold within the United States.

### 1. The ATA Board

59. The ATA is governed by a Board of Directors made up of various representatives from manufacturers, distributors, and retailers of Archery Products. The Board, per Section 5.01 of the ATA's bylaws, manages "all of the [ATA's] activities and affairs[.]"

60. Throughout the Class Period, a number of agents from Manufacturer Defendants and Retailer Defendants, including those engaged in horizontal competition, have served on the

18

ATA's Board of Directors. For example, Manufacturer Defendants BowTech, Hoyt, Lancaster Archery Supply, Mathews and PSE all had representatives on the Board in 2018 and 2019. Retailer Defendants BPS, Cabela's, Jay's Sporting Goods, and Kinsey's had representatives on the Board at various times between 2014 and 2024.

### 2. The ATA Retail Council

61.     In 2016, the ATA "revitalized its Retail Council to provide more guidance and support to the organization's retail members." At the time of the relaunch, ATA Retail Council members emphasized the need for coordination between its members. McAninch stated that the Council was "ready to help forage a better future for everyone in our industry." Mark Copeland, the Retail Council's then Chair, and general manager of Defendant Jay's Sporting Goods, stated that retailers needed "an active and engaged platform . . . to discuss important issues where the conversation is educational and productive. I keep hearing that retailers are the industry's backbone. I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

62.     Throughout the Class Period, a number of agents from Retailer Defendants, including those engaged in horizontal competition, served on the ATA Retail Council. For example, within the Class Period, agents from Retailer Defendants Bass Pro Shops, Lancaster Archery Supply, and Jay's Sporting Goods had representatives on the Council.

63.     Following its reestablishment, the Retail Council has met weekly "to discuss pressing issues." These pressing issues included MAP policies and their enforcement. For example, on March 20, 2019, Kurt Smith, then a member of the Council, and the ATA's Director of Industry Relations for the Retail Council, stated that MAPs were "probably one of the most talked about topics in the archery industry."

19

### 3. ATA Trade Shows

64.     The ATA runs the "ATA Show," an annual trade show event centered on the archery and bowhunting industries. It is the largest archery-only trade show in the world and, according to www.bowhunting.com, "the archery industry's biggest event of the year." In 2024, one ATA exhibitor described its continued importance by saying: "You haven't done squat in this industry until you get invited to exhibit at the ATA."

65.     Throughout the Class Period, the ATA Trade Show has only been open to ATA members. The ATA implemented this requirement in 2011 specifically to prevent the attendance of "those who undercut the ATA's pro shop dealers…"

66.     The ATA trade show is heavily attended by retailers and manufacturers engaged in horizontal competition. For example, in 2016, every major bow manufacturer was present at the show.

67.     Throughout the Class Period, the need for active enforcement of MAP policies has been openly discussed at the ATA's trade show. At one show in 2019, Ben Summers, the Director of Operations for a manufacturer, T.R.U. Ball Archery, and a former Vice Chairman of the ATA Board of Directors, stated that he "discussed MAP policies regularly with retailers and distributors." At that same show, T.R.U. Ball Archery posted its three-tier MAP policies on placards within its booth, reading "1. T.R.U. Enforces MAP! 2. T.R.U. Gives Shooter, Dealer Credits. 3. T.R.U. Does Not Give Huge Under-MAP Discounts to Your Customers."

### 4. ATA Connect

68.     The ATA, as a benefit of membership, offers a members-only online discussion community called ATA Connect. ATA Connect includes the MyATA Network, which can be

20

accessed by all ATA members regardless of membership type, and the Retail Growth Interact community, which is "exclusive to ATA-member retailers."

69.     The ATA has, throughout the relevant period, invited its members to use ATA Connect to exchange competitively sensitive information, including those related to pricing. For example, as of 2018, the ATA specifically identified Retail Growth Interact as a "great place to share ideas and ask questions about the topics that matter most to your business, including buying patter[n]s, profit margins and what to charge for services."

### 5.   The ATA Retail Business Tracker Survey

70.     In 2022, the ATA announced the release of the ATA Retail Business Tracker Survey. This was described as a "new quarterly survey to gain insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening nationally." The ATA explained that it would put together a Retail Trend Tracker survey each quarter, send the questionnaire to retailer members of the ATA, then "share[] the data gathered from the survey with distributors, manufacturers, and retailers in an easily digestible report."

71.     An ATA article discussing the new survey, entitled "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data About Market Trends," displayed the kind of competitively sensitive information it would gather, including seasonal data, sales by product type, and price ranges. The ATA made clear that horizontal competitors could use this information to coordinate pricing: "[t]his data allows you to see how your shop compares to your peers."

72.     The collection of this survey data by the ATA and its exclusive distribution to members of the ATA helped facilitate Defendants' conspiracy by ensuring that, within the Class

Period, each Defendant had effective, up-to-date retail price information with which to carry out their conspiracy.

## C. **Defendants' Agreement to Adopt and Enforce MAP Policies in Order to Establish Supracompetitive Prices for Archery Products**

73. Throughout the Class Period, ATA members viewed retail price competition for Archery Products as a threat to profitability. Therefore, beginning in 2014, Manufacturer Defendants, Retailer Defendants, and their co-conspirators began utilizing the ATA to generate and carry out an unlawful conspiracy to lessen competition for Archery Products through the coordinated adoption and enforcement of MAP policies.

74. The ATA participated in this conspiracy by pushing its membership to adopt and enforce MAP policies, and by actively assisting their members, including Defendants and their co-conspirators, in the enforcement of those MAP policies. The goal and effect of this conspiracy was to artificially fix, raise, maintain, and/or stabilize the price of Archery Products sold throughout the United States at supracompetitive levels.

### 1. **The ADA Begins Encouraging Manufacturers and Retailers to Adopt and Enforce MAP Policies**

75. MAPs existed in the Archery Product industry well in advance of 2014. However, such policies were often ineffective, because Archery Product manufacturers and retailers found it difficult to compete with their competitors who did not set up or enforce such policies. Absent some mechanism for collective enforcement against violators, manufacturers which did not have, or did not enforce, a MAP policy could take share from competitors who did, while retailers retained incentives to increase volume by disregarding such policies, or by working with manufacturers which did not have, or enforce, MAP policies.

76.     As a result of this lack of enforcement of MAP policies, ATA distributors and retailers began to express concern about the deleterious effects that price competition was having on their bottom line. In 2011, McAninch responded to a complaint from one distributor by stating that the ATA was "working to identify ways to ensure members honor MAP without the ATA acting as an enforcer." McAninch cautioned that, at this stage, the ATA could only help by acting as a general information exchange:

> Since all sectors of the industry are ATA members, our role will be to promote business practices that are best for everyone and urge all members to work to that end. By giving dealers a chance to talk openly about pricing issues in a forum and being sure manufacturers have a chance to hear and react to any concerns raised, we think this problem can be substantially improved.

77.     In late 2014, the ATA began to take more aggressive steps towards the adoption and enforcement of MAP policies by its members. In a blog post posted on December 31, 2014, McAninch actively encouraged companies to stop ignoring MAP, instructing them that "United We Stand, Divided We Fall." He reiterated that "everyone must participate" because "if we don't address the damage to our business model, we risk losing, in the long term the sustained growth we've enjoyed." He also stated that the ATA could act as a center for coordination between competitors on MAP policies: "In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP." He added that "Since this involves everyone the ATA is the right group to facilitate this discussion and provide the vehicle for the industry to unite behind constructive, positive changes." In McAninch's blog post, the ATA issued a draft MAP policy for manufacturers designed to "protect our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product pricing."

23

78.     Throughout the next year, the ATA began taking greater steps to ensure that its members were made aware of the need to adopt and enforce MAP policies. On January 10, 2015, at a seminar at the ATA Trade Show, McAninch invited some 60 representatives of ATA member manufacturers, distributors, and retailers to review a sample MAP policy. These participants were told that, if they wanted to control price, "each business must create its own [MAP] policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiations."

79.     After the trade show, the ATA issued a newsletter counseling its various members, many of which engage in horizontal competition, on crafting "customized" policies to protect their minimum advertised price. The newsletter assured them that "the ATA can provide help and information so individual manufacturers can craft their own policies, which the companies must then enforce themselves." It also revealed the ATA's "three-step plan" to help its members generate and enforce their own MAP policies. The ATA ensured that these "three-steps" were broadly disseminated, tweeting on February 9, 2015, their "Three steps to developing a sample Minimum Advertised Price policy."

80.     Various retailers, including Retailer Defendants, followed these signals from ATA representatives. For example, in June of 2015, Kinsey's announced their "new Minimum Advertised Price (MAP) policy," stating that "MAP policies exist to benefit both retailers and manufacturers by elevating perception of brand value, which leads to increased margins for retailers." For this, Kinsey's was applauded by Randy Wood, Vice President of Sales for the manufacturer TenPoint Crossbow Technologies: "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin."

24

81.     By March 2016, the ATA was actively working to ensure that its member manufacturers, distributors, and retailers were enforcing the rules of its cartel by adopting and cooperatively enforcing MAP policies. At that time, the ATA was directing all "Members Interested in MAP Policies" to contact the ATA "for resources about creating a MAP policy for [their] company." The ATA made clear that such resources were "available only to ATA members and are included in your membership."

82.     In a now deleted March 15, 2016 article posted on the ATA's website entitled "ATA Members Weigh In on MAP", an ATA agent represented that: "the ATA and its member companies have worked tirelessly to discuss, craft and enforce MAP policies that could help manufacturers, retailers and the industry." The article went on to relay conversations between the ATA and various Archery Product retailers and manufacturers. These conversations were full of signals from these retailers and manufacturers that other industry participants should use the ATA to coordinate with their competition in order to ensure the consistent adoption and enforcement of MAP policies.

83.      First, Mike Ellig, founder of Black Gold, Inc., a manufacturer, recounted how McAninch personally spoke with him about creating a MAP policy, connected him with lawyers, and told him about resources to help enforce the policy. Ellig noted that, following the ATA's efforts, more companies were adhering to MAP policies, and he himself "cut off" people who wouldn't abide by them. He reflected on how MAP would "help" both retailers and manufacturers: "[i]t takes extra effort to get a MAP policy right, but the long-term impact of doing it right is 10 times greater than the short-term impact of getting the same."

84.     In that same article, another prominent industry player, Marty Stubstad, former owner of Archery Headquarters, and the then-president of the Archery Range and Retailers

Organization ("ARRO"), urged manufacturers to "approach this problem like it's enforceable and be determined to enforce their policies." He added that "many dealers might not know how to price certain products, but MAP helps them learn what profit margin they need to make their business survive."

85.     Bruce Hudalla ("Hudalla"), the President of Hudalla Associates, which "helps manufacturers with MAP policies and also tries to ensure retailers follow MAP policies," stated that "I support MAP because it maintains the value of products and allows my customers—retailers and manufacturers—to operate at profitable margins." Hudalla then applauded the ATA for helping to coordinate the conspiracy by doing "an excellent job getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts and sample policies."

86.     Jay Scholes, co-founder of an outdoor industry sales firm called OutTech, emphasized that MAP was an opportunity for retailers and manufacturers to "work hand in hand." He added that "We're responsible for upholding our sport, for making sure our retailers make money, and ensuring manufacturers also make money. MAP is a good thing for our industry."

87.     Last, also in that article, Ben Summers, Operations Director at T.R.U. Ball Archery Releases and Axcel Archery Sights, and then-vice President of ATA's Board of Directors, recounted how "[McAninch] always talks about shining light in dark corners so people can be seen for what they're doing, and be held accountable." He stressed the importance of enforcing MAP to the ATA's members: "If you have a MAP price structure, you must be smart and proactive about going out and finding people who break your MAP policy."

88.     By 2017, T.R.U. Ball Archery Releases would provide an exemplar of how to effectively participate in the ATA's conspiracy by adopting a schedule of strict penalties for

26

"MAP Violators" at all levels of the supply chain. For retailers who sold T.R.U. Ball Archery

Releases products directly to consumers, the following conditions applied:

**New MAP Violator:**
A warning will be issued. Violator will be evaluated in approximately two weeks to determine if they have raised prices to MAP levels.

**Repeat MAP Violator:**
First repeat infraction – Violators who have been notified that they are below MAP pricing within the last six months will be given a 48 hour warning to raise prices to MAP levels. Violators who have not raised prices to MAP levels after this time period will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days.

**Second repeat infraction:**
Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 60 days.

**Three or more repeat infractions:**
Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for more than two times will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days.

For distributors who sold T.R.U. Ball Archery Releases products to other resellers,

additional conditions applied:

**Distributor Violators:**
T.R.U., Inc. will be using contacts from around the United States to purchase products from sources who are known to be violating MAP levels.

**First infraction:**
Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 30 days.

**Second infraction:**
Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 60 days.

**Third infraction:**
Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List indefinitely.

89. These discussions indicate that, by this point, Defendants' and their co-conspirators' conspiracy was succeeding in pushing ATA members to coordinate in the adoption and enforcement of MAP policies in order to artificially fix, increase, or stabilize the price of Archery Products.

### 2. The Expanded Influence of Retailers Within the ATA Lead to the Formation of the Cartel and the Expanded Promotion and Enforcement of MAPs

90. It is no coincidence that the formation of the instant cartel, and the ATA's shift towards broader adoption and enforcement of MAP policies, coincided with the expanded influence of retailers within the organization. In fact, the ATA's 2014 shift from being a locus of discussion for MAPs, towards actively directing and encouraging its manufacturers, distributors, and retailers to institute and enforce MAP policies, directly followed the addition of representatives from two Retailer Defendants, Bass Pro Shops and Cabela's, to its Board. The addition of these large retailers to the ATA's Board gave all members of the conspiracy a more effective means to coordinate the institution and enforcement of stringent MAP policies across the industry.

91. Retailers stood to benefit most from the conspiracy to raise prices through the adoption of MAP policies. Kinsey's, upon adopting its MAP policy in 2015, specifically noted that such policies would expand margins for retailers such as themselves. Therefore, as enforcement of MAPs expanded, retailers tended to act as the strictest enforcers of Defendants' conspiracy. For example, in the above ATA article, Hudalla reiterated that he "hears more about

28

MAP violations from retailers than from manufacturers because many retailers police themselves."

92.     As the 2010s continued, retailers continued to expand their influence within the ATA and generated more organizational communication channels through which they could carry out the conspiracy. First, in May 2016, the ATA Board announced it was reinstating the Retail Council to "improve the industry's archery and bowhunting markets." McAninch noted that the industry's success "depends largely on the success of archery and bowhunting retailers." Mark Copeland, general manager of Defendant Jay's Sporting Goods, signaled to other retailers that they should coordinate with their horizontal competitors to increase prices: "I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

93.     In July of 2017, the ATA Board was expanded to add seats for representatives from the National Archery Buyers Association ("NABA"), which features a number of retailers and distributors of Archery Products, and from ARRO. McAninch welcomed this expanded influence for retailers, saying their representation "ensures ATA Board discussions are balanced, and consider all aspects of business in our industry." NABA's President Gary Kinard noted that it was "refreshing to see the ATA Board of Directors recognize the need for better representation for the independent retailer." ARRO's executive secretary, Deb Colgrove, similarly remarked that the ATA had recently "been working to help retailers be more profitable," and expressed her hope that this Board seat would continue to strengthen communication between ARRO, the ATA, and various manufacturers.

### 3. The ATA Begins Working with Co-Conspirators to Offer Retailers and Manufacturers Expanded Means to Enforce MAP Policies

94.     Following this increased influence for Archery Product retailers within the ATA, the organization further expanded its MAP-related offerings for members. In October 2017, the

ATA launched, and promoted on Facebook and Twitter, a new "MAP Resource Library" exclusively for ATA members. This resource allowed retailers to actively monitor whether manufacturers had adopted MAP policies. In addition, it gave them the chance to access software which helped enforce MAP policies at a discounted price:

> ATA staff are compiling manufacturers' MAP policies and posting them in the Member Only area of the ATA website. This MAP Resources Library helps retailers learn which manufacturers have MAP policies, and helps retailers to understand and comply with them. Several policies are already posted, and the ATA will add more as manufacturers provide them. If you're a manufacturer and need help monitoring how well retailers adhere to your MAP policy, the ATA can help you, too. MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers.

> The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library. If your company has a MAP policy, or if you have questions, contact Wendy Lang, ATA membership manager, at wendylang@archerytrade.org. To capitalize on these ATA-member benefits, join the Archery Trade Association today.

95.     In setting up this program, the ATA began working in conjunction with Software Defendants, TrackStreet and Oris. Both firms offer digital platforms which enable users to track and enforce pricing policies, including MAP policies.

96.     As of September 18, 2017, TrackStreet described its MAP software as offering an improved level of enforcement and automation, promising to "ensure that violators receive violation notices," and "continuously scour the web" to locate violators. As of May 30, 2025, TrackStreet continued to advise retailers that "it's important to ensure you're enforcing your [MAP] policies consistently," and advertised its services as helping to facilitate that enforcement.

97.     Oris advertises its MAP software, known as Prowl, as "offer[ing] the best protection brands can get. With real-pricing data and a convenient dashboard for tracking and

30

responding to MAP violations, you can trust that violators will never slip through the cracks, and MAP monitoring will feel a lot more manageable."

98.     Following its October 2017 announcement, the ATA offered and advertised discounted programs with Oris and TrackStreet for ATA members, so they too could "scour the internet for MAP violators." In essence, the ATA was facilitating the coordinated enforcement of MAP policies by subsidizing its members' ability to access software which identified MAP violators and sent out notices of violations. Oris and TrackStreet, in providing this technology, were aware of, and profited from, their role in Defendants' and their co-conspirators' conspiracy to artificially inflate the retail prices of Archery Products through the coordinated adoption and enforcement of MAP policies.

99.     ATA representatives actively promoted these discounted enforcement mechanisms from Software Defendants over the next several years. Their promotions signaled to industry participants that they should join Defendants' conspiracy. On March 11, 2019, the ATA's new President & CEO, Matt Kormann ("Kormann"), discussed MAP monitoring and enforcement on the *Bowjunky* industry podcast. On the podcast, the host noted that he had seen several releases from the ATA relating to MAP pricing and TrackStreet. Kormann explained that "TrackStreet has been a huge win for our manufacturing members who have chosen to work with them." He provided an example of a manufacturer who used TrackStreet to decrease MAP violations following the ATA's partnership because, previously, not all manufacturers could afford to hire someone to enforce their MAPs. This wider adoption made the program a "huge win." Kormann went on to suggest that the *Bowjunky* podcast invite a TrackStreet representative onto the program to discuss MAP enforcement.

31

100.     Per Kormann's suggestion, the *Bowjunky* podcast invited Ryan Erickson, Vice President of Sales at TrackStreet ("Erickson"), onto the show. During the episode, the host mentioned that the ATA had endorsed TrackStreet and informed ATA members about the service. Erickson emphasized the importance of MAPs: "[T]he only thing worse than not having a MAP policy as a brand is having one and not enforcing it . . . we have all agreed this is the right thing, so now we have to finish this up."

101.     Given that the price for services from Oris and TrackStreet absent any discount can exceed $1,000 per month, the ATA's negotiated discounts helped manufacturers, retailers, and other industry participants adopt MAP policies more broadly, and, in turn, helped punish participants who tried to offer Archery Products for a lower price.

102.     From 2018 onward, Defendants, through the ATA, continued their conspiracy to coordinate the industry-wide adoption and implementation of MAPs. In September 2018, the ATA updated its website to remind manufacturers that the ATA "would work with [them] to develop a MAP policy."

103.     In December 2018, the ATA again updated its website to include a special prompt for manufacturers to send the ATA their MAPs to load onto the members-only "Resource Library." The ATA cautioned retailers that it was their "responsibility to know MAP policies and follow them."

104.     On January 12, 2019, the ATA posted a blog post comparing MAP enforcement to "hunting coyotes" in a "season that never ends." In that same post, Kurt Smith, then the ATA's Director of Industry Relations, reiterated his signals to ATA members to adopt and stringently enforce MAP policies: "You can't create anything and then just sit back and enjoy watching it work. A good MAP policy is far more than just a MAP column on a company's price sheet.

32

Companies can set their policies and clean up the worst MAP violations, but their job is never really done." Smith also emphasized the need for industry participants to coordinate while doing so:

> It's a constant whack-a-mole or cat-and-mouse game with people who just want to make a quick buck. They aren't worried about long-term profitability . . . If a company creates a good partnership with its distributors and retailers to catch violators, it can cut them out of the supply chain and force them to look for easier prey . . . We'll never get rid of them, and there's no magic wands . . . That's why it's so important for ATA members to work together as much as possible.

105.    On March 20, 2019, the ATA hosted TrackStreet's Erickson on its own podcast *Beyond the Bow* for an episode entitled "MAP Policies & Enforcement." On the episode, Kurt Smith, the host, introduced MAPs as "one of the most talked about topics in the archery industry." Throughout the conversation, Erickson emphasized the importance of creating and enforcing MAP policies: "[E]ach individual brand has to be on the same page . . . [A]t the founding of our country, Benjamin Franklin said we must all hang together or most assuredly, we'll hang separately." Later in the podcast, Erickson emphasized the importance of larger firms adopting MAP policies, and how that would inspire others in the industry to follow: "[A]s soon as a couple big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward." Last, Erickson thanked the ATA for all the work they performed to encourage the adoption of MAP policies throughout the industry: "I would say [it] is unparalleled in terms of the efforts that the ATA is making."

106.    The next day, the ATA promoted this podcast on both Twitter and Facebook.

107.    Although most actively promoted by retailers, manufacturers who participated in this conspiracy also reaped the rewards. In 2019, T.R.U.'s vice president, Ben Summers, attributed the firm's "really high" 2018 sales to the firm's stringent adoption of MAP policies. Other manufacturers emphasized their desire to collaborate with retailers on enforcement: Barb

Terry, a customer relations director at TenPoint Crossbow Technologies, said they encouraged all their retailers to be "MAP watchdogs" because "we don't want to see someone take money out of our customers' pockets."

108.     Manufacturers, distributors, and retailers also emphasized the importance of MAP policies, and the stringency with which they followed them, in trade journals. These statements, again, served as signals to other ATA members to join Defendants' conspiracy. For example, in the August 2019 edition of *Inside Archery*, it was noted that "Kinsey's is using its far-reaching influence to help enforce MAP policy. This effort is also geared towards helping dealers and strengthening the industry at large." Justin Gorman, director of sales at Kinsey's added:

> We work closely with our vendor partners and retail partners to monitor and enforce MAP policy. There are a lot of methods out there, and there really is no simple solution, *but by working together*, we have the ability to bring positive change to the industry. Kinsey's has a very up-to-date and sophisticated warehouse management system, and it allows us to automatically restrict sales to shops that violate MAP. It's not something we need to remember to jot down on a notepad, it's programmed into the system . . . Kinsey's certainly can't solve this problem by itself. Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules.

Gorman emphasized that when a violator is caught, "they lose the ability to buy that product from [Kinsey's]. They also can't buy it online or through the manufacturer because we work closely with vendors to build a 'do-not-sell' list."

109.     In that same article, Phil Robinson, President and CEO of Tink's, which sells a number of accessories used in bowhunting, emphasized, in relation to efforts to ensure that certain hunting scent products did not cause Chronic Wasting Disease, the ease with which horizontal cooperation could occur within the Archery Product industry: "It was so important for us to work with our competitors [in the archery industry], and that's one of the greatest things about this

industry. They might be competitors of ours, but it's always been easy to start a friendly conversation with them."

110.    In the December 2019 issue of *Inside Archery*, a representative from Victory Archery stated that they spend "a great deal of time and energy to enforce MAP pricing[.]"

111.    The March 2020 issue of *Inside Archery* quoted one David Kronengold, a former general manager of PSE, as saying: "The industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. **And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors** [emphasis added]."

112.    The December 2020 issue of *Inside Archery* quoted Phaen Pittman, manager at the retailer Performance Archery:

> The purchasing side is where we put a major emphasis on who we do business with and why . . . We're constantly researching to find the best products, backed by companies with strong MAP policies and good dealer margins . . . So many shops miss the mark by buying products unsupported by a MAP, and they find themselves in a discount battle with online retailers.

113.    In 2020, Kormann published a blog post titled "CEO Blog: Importance of MAP", where he, again, emphasized the need for retailers to stringently enforce their MAP policies:

> Buying habits have also changed for consumers and business owners. We can't turn back the clock and delete the internet–no matter how appealing that might sound, especially to parents. That evolution keeps MAP in a spotlight. With just a couple of taps on an iPhone we can pull up our competitors' retail pricing. For pro shops, that means it's easier to identify potential violations of MAP policies. The first reaction might seem obvious: Manufacturers with solid MAP policies should be out there policing their retail channels. The reality is more complex. Doing so takes time and resources during a stretch in our industry where both are at premiums. It might be even more simple to assume every retailer should just follow those policies, but as long as we live in a free and competitive market, some business owners will make decisions others might not like.

35

114. Since 2021, the ATA has taken steps back from its public endorsement of MAPs. Multiple articles on the ATA's website which pushed for stricter enforcement of MAPs have been deleted in order to obscure the organization's central role in the conspiracy.

115. Yet Defendants' conspiracy continues through the present. The ATA continues to offer its help "to work with [its members] to develop a MAP policy." It still offers discount programs for ATA members to hire outside vendors to seek out MAP violators. And various ATA members, including Retailer Defendants and Manufacturer Defendants, continue to use MAPs and advertise products under MAPs. For example, in both the January 2023 and January 2024 editions of *Inside Archery*, Steve Greenwood, a General Manager at Victory Archery, stated that "We police MAP 24/7."

### D. Defendants' Agreement to Exchange Competitively Sensitive Information in Order to Raise Prices to a Supracompetitive Level

116. In addition to facilitating a conspiracy to increase the price of Archery Products by pushing for the coordinated growth, adoption, and enforcement of MAP policies, the ATA has, throughout the Class Period, provided opportunities for its members, many of which engage in horizontal competition, to exchange competitively sensitive information. In fact, the ATA has actively *promoted* their channels as a means to exchange such information.

117. In 2017, the ATA launched its ATA Connect service, which allowed its members to engage in conversations exclusive to members.

118. In 2018, the ATA released a "Polls" service on ATA Connect, through which "ATA staff conduct polls on ATA Connect every other week." The polls are "measures of where ATA members stand on industry issues," and help "members learn how they align with others."

119. In 2019, the ATA generated a specific channel for ATA member retailers called ATA Connect's Retail Growth Interact. The purpose of this channel was to have "a great place to

share ideas and ask questions about the topics that matter most to your business, including buying patterns, profit margins, and what to charge for services."

120. Shortly thereafter, ATA announced that it was releasing My ATA Network, yet another members-only channel in which members of the ATA could discuss sensitive competitive information: "Distributors, manufacturers, retailers and other ATA members have different business goals, objectives and operations. That's why the ATA is creating My ATA Network, an open forum which helps all ATA members work together to grow archery and bowhunting participation while boosting their businesses."

121. In 2022, the ATA announced the release of the ATA Retail Business Tracker Survey. This was described as a "new quarterly survey to gain insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening nationally."

122. The ATA went on to explain that it would put together a Retail Trend Tracker survey each quarter, send the questionnaire to retail members, then "share[] the data gathered from the survey with distributors, manufacturers, and retailers in an easily digestible report."

123. An ATA article entitled "ATA Members Capitalize on Data Shared in ATA's Retail Trend Tracker Survey" made clear that the survey would be useful to nominal competitors. Because "each region of the country is represented in the report, retailers and manufacturers can study any discrepancies in the results and adjust accordingly, based on the data in their region." The article also described the information provided within the survey, including "equipment sales, buying habits, and whether the customers are interested in target archery or bowhunting…It's a win-win for retailers and manufacturers alike."

124.    Another ATA article, entitled "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data About Market Trends," displayed the granular nature of the information provided in these surveys, including:

- Percentage of merchandise sales by product category, types of bows, price ranges of bows, customer experience level, and foot traffic;

- Seasonal market conditions, business challenges and customer reactions;

- Sales data describing which price range customers are gravitating toward, percentage of sales of each product type; bows, arrows, accessories and services such as coaching or bow technician work.

The ATA made clear that:

> [t]his data allows you to see how your shop compares to your peers. Manufacturers and retailers can also get a sense of how much inventory they should have on hand. Comparing your inventory with that of other shops in your region can help you determine whether what you have is working or give you a sense of how you might increase or decrease it.

125.    Until 2024, the ATA Retail Business Tracker Survey was available exclusively to ATA members who are, as alleged herein, industry participants such as retailers, manufacturers, and distributors, including Defendant Retailers. Therefore, for much of its existence, the ATA Retail Business Tracker Survey consisted of a set of competitively sensitive information which was compiled by the ATA from its member retailers, many of whom engage in horizontal competition, then distributed by the ATA right back to those same retailers.

126.    The FTC has explicitly warned against this type of conduct. In guidance entitled "Spotlight on Trade Associations," the FTC warned:

> [E]mployees should be careful when sharing information they could not otherwise share with competitors through intermediaries such as a financial analyst or even a supplier if the consultant were to share that specific information with the company's competitors, resulting in a change in their pricing strategy, such indirect

38

communications could be seen as facilitating an agreement if other evidence points to a coordinated strategy.

127. In February 2023, Doha Mekki, then-Principal Deputy Assistant Attorney General for the DOJ's Antitrust Division, noted that "exchanges facilitated by intermediaries can have the same anticompetitive effect as direct exchange among competitors."

128. The various means of communication between competitors that the ATA has generated and disseminated, such as the ATA Trade Shows, ATA Connect, ATA Retail Connect, the ATA Retail Business Tracker, and other forms of communication described herein, have allowed Defendants and their co-conspirators to exchange competitively sensitive information regarding price, with the specific intention and effect of increasing, stabilizing, or otherwise manipulating the price of Archery Products.

### E. Defendants' Scheme Has Caused Anticompetitive Effects

129. Defendants and their co-conspirators, through their exchange of competitively sensitive information, and their conspiracy to fix, increase, or stabilize the price of Archery Products through the coordinated the adoption and enforcement of MAP policies, were able to ensure that consumers of Archery Products were charged supracompetitive prices.

130. MAP policies restrict competition and increase prices for consumers through two means. First, once adopted by a critical mass of horizontal retail competitors, MAPs reduce the incentives for those retailers to engage in horizontal price competition. Retailers subject to an effective MAP face no incentive to vigorously compete by advertising their lower retail prices because, should they do so, they would threaten their supply for the goods in question. Even if the retailer does, in fact, offer a lower price for the goods, MAPs prevent them from advertising that lower price. Second, even if retailers still retain incentives to offer discounts following the adoption of MAPs, the MAP sets the terms of price negotiation at an artificially high level. An

arrowhead which is discounted from the MAP will still be sold at a level higher than its actual competitive price because the MAP raises the "starting price," or the price range, from which any discounts on that arrowhead are calculated.

131.    Indeed, ATA member retailers have recognized that MAP policies affect downstream consumer prices. In June of 2015, Kinsey's acknowledged that the adoption of such policies increased their margin: "MAP policies exist to benefit both retailers and manufacturers by elevating perception of brand value, which leads to increased margins for retailers." Randy Wood, Vice President of Crossbow Technologies, similarly acknowledged that "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin."

132.    Defendants' information exchange also has had the effect of harming competition for Archery Products. This information exchange allows retailers access to information from their horizontal competitors on prices, supply, demand, and other key factors which, in a competitive market, would be unknown. With this non-public information known to horizontal competitors, those competitors have less incentive to engage in competition.

133.    Indeed, the existence of this information sharing agreement is particularly egregious given that these products are also subject to a MAP. According to the ATA, MAP policies are intended to ensure that retailers compete based on their provision of services; they can then "compete fairly and evenly on service instead of price." Yet, as of July 30, 2019, the ATA's website described the Retail Growth Interact communication channel as a place for retailers to coordinate on the price of *those same services*: "[a] great place to share ideas and ask questions about the topics that matter most to your business, including buying patter[n]s, profit margins and **what to charge for services** [emphasis added]."

40

134.     Defendants' provision of competitively sensitive information relating to non-price variables also allowed for stronger coordination of their separate scheme to coordinate the adoption and enforcement of MAPs, as it allowed Defendants and their co-conspirators to ensure that their horizontal competition was not undercutting the MAP price.

135.     Defendants' and their co-conspirators' agreement has resulted in a high cost of Archery Products for consumers. In one 2016 post on the online forum *Archery Talk*, one retailer noted that:

> Today vertical bows are exceeding 1000-1500 [dollars] on a regular basis, a dozen crossbow arrows are over $80 and can cost up to 250 if you want custom work, firenock arrows are over $600 a dozen, vertical arrows are exceeding $200 for hunting aroows [sic], don't get me started on target aroows [sic], X10 Pro Tours are over $400 for bare shafts, points can be around $300. The average pay hasn't moved much in years.

136.     Other posts in *Archery Talk*, including one from Wyvern Creations, a smaller retailer, have acknowledged that MAPs have been used to artificially fix, maintain, or stabilize retail prices:

> Many MAP agreements state that you are more than able to sell below MAP but if you do you will simply not be allowed to sell the product. Quite a few dealers have found out their sources simply will not sell to them after violating MAP. ***The reality is that many MAP agreements (Scorpyd or Tenpoint for example) are actually MRP (minimum retail price).***
> . . .
> ***The big mistake here is that in many instances MAP DOES limit the actual selling price if the dealers want to continue to sell the product.*** The attitude (and basically what is in the agreement) from the manufacturers is that 'you can sell for whatever you want [] but I don't have to sell my product to you if you choose to do so." Consumers generally don't like it [because] they feel the 'bottom line' should be fluid and the 'race to the bottom' is how dealers have to compete. ***Dropping your price is the easiest and worst way to compete***.

### VI.     IMPACT ON INTERSTATE TRADE AND COMMERCE

137.     Beginning at least as early as January 1, 2014, and continuing until the present, Defendants and their co-conspirators engaged in a continuing conspiracy or combination in

restraint of trade in violation of the Sherman Act. Throughout this period, Defendant Manufacturers and Defendant Retailers sold substantial quantities of Archery Products in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where Defendants maintain their principal place of business.

138. Defendants' and their co-conspirators' conspiracy has had a direct, substantial, intended, and foreseeable impact on interstate commerce in the United States and its territories. One source estimated that the market for Archery Products represented over $1.2 billion as of 2021, with further growth since then, and more projected in the future.

139. Both the Manufacturer Defendants and Retailer Defendants knew their Archery Products would enter the U.S. stream of commerce and affect United States commerce, and cause harm to Plaintiff and the proposed Class through the payment of supracompetitive prices for Archery Products.

140. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize or otherwise maintain the price of Archery Products at supracompetitive levels.

## VII. ANTITRUST INJURY

141. The agreement between Defendants and their co-conspirators to fix, increase, stabilize, or otherwise maintain the price of Archery Products at artificially high levels directly damages Plaintiff and restrains competition in the market for Archery Products. Defendants' antitrust conspiracy had the following effects, among others:

    a. Price competition has been restrained or eliminated with respect to Archery Products;

b. Prices of Archery Products have been fixed, raised, stabilized or otherwise maintained at artificially inflated levels;

c. Buyers of Archery Products have been deprived of the benefits of free and open competition; and

d. Plaintiff and other Class members have paid higher and artificially inflated prices for Archery Products as a direct, foreseeable, and proximate result of Defendants' conduct.

142. The purpose of Defendants' and their co-conspirators' unlawful conduct was to fix, raise, stabilize or otherwise maintain the price of Archery Products at artificially high levels.

143. The antitrust laws aim to prevent injuries such as those alleged herein, which stem from a conspiracy among sellers to systematically raise the price paid for a good or service, such as Archery Products.

144. But for Defendants' conspiracy, Plaintiff and other members of the proposed Class would have paid less for Archery Products. Paying inflated prices caused by an unlawful agreement is a quintessential antitrust injury.

145. By reason of the alleged violations of the antitrust laws alleged herein, Plaintiff and the other members of the Class have sustained injury to their business or property, having paid higher prices for Archery Products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiff and the other members of the Class have suffered damages in an amount presently undetermined. However, the precise amount of overcharge affecting the prices of Archery Products can be measured and quantified using well-accepted models. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish, remedy, and prevent.

43

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Fraudulent Concealment

146.     Plaintiff's and Class members' claims are not barred by the applicable four-year statute of limitations governing claims under the Sherman Act because any applicable statute of limitations was tolled pursuant to the doctrine of fraudulent concealment.

147.     Plaintiff and the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conduct alleged herein prior to retaining counsel in 2025.

148.     The conspiracy alleged herein was fraudulently concealed by Defendants and their co-conspirators using various communication channels available only to ATA members, including, but not limited to, members-only ATA-created online communication channels, private meetings, trade shows, and telephone meetings and in-person conversations used to prevent the existence of written records. Defendants also conducted their conspiracy through various organizations within the ATA, including the Board of Directors and Retail Council meetings, which are closed even to most other members of the ATA.

149.     Defendants' conduct was also self-concealing given that Defendants hid their conspiracy through the term "MAPs" when, in fact, such policies were only utilized in relation to a scheme to artificially raise prices and restrict competition.

150.     Much of the evidence related to the ATA's facilitation of the instant conspiracy was removed from their website around 2021 and was, absent the assistance of counsel, insufficient to put consumers on proper notice of Defendants' conspiracy.

151.     Due to Defendants' and their co-conspirators' concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to

44

any claims and rights of action that Plaintiff and Class members have as a result of the unlawful contract, combination, or conspiracy alleged herein.

### B. Continuing Violation

152.    Plaintiff's and Class members' claims are also not barred by the applicable four-year statute of limitations governing claims under the Sherman Act because any applicable statute of limitations was tolled pursuant to the doctrine of continuing violations.

153.    A continuing violation restarts the statute of limitations period each time Defendants committed an overt act.

154.    The prices for Archery Products sold by Defendants and their co-conspirators were, throughout the Class Period, fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreements.

155.    Each of Defendants' and their co-conspirators' meetings and misrepresentations, performed in furtherance of said agreements, were overt acts which began a new statute of limitations because each act advanced the objectives of Defendants' conspiracy by adapting it to new market conditions. These overt acts, which were new acts beyond the initial acts to fix the price of Archery Products, were necessary to perpetuate Defendants' agreement, and continued throughout the Class Period.

156.    By constantly taking action to renew and refine their agreement to reflect changing market conditions, Defendants inflicted new and accumulating injury on Plaintiff and the Class members.

157.    In addition, throughout the Class Period, Defendants and their co-conspirators continued to make sales of Archery Products to Plaintiff and the Class at supracompetitive prices.

45

Each sale of Archery Products by a Defendant or their co-conspirator at a supracompetitive price was a new overt act which was part of Defendants' conspiracy.

158.     Each purchase by Plaintiff and Class Members of Manufacturer and/or Retailer Defendants' Archery Products throughout the Class Period, the price of which changed according to Defendants' continually renewed and adjusted price-fixing agreement, necessarily caused new and accumulating injury to Plaintiff and Class members.

159.     As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at earlier times. This means that each illegally priced sale of Archery Products to Plaintiff and Class Members constituted a new cause of action for purposes of the statute of limitations.

## IX.     CLASS ACTION ALLEGATIONS

160.     Plaintiff brings this action for damages and injunctive relief on behalf of himself and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3), with the Class initially defined to include ("the Class"):

> All persons and entities in the United States and its territories who, between January 1, 2014 and the present (the "Class Period"), purchased from a Retailer or Manufacturer Defendant or any of their co-conspirators one or more of the Archery Products manufactured or distributed by an Archery Trade Association member (or from any division, subsidiary, predecessor, agent, or affiliate of any such member).

161.     This class definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, affiliates, or agents; (d) all governmental entities; (e) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (f)

46

the judges and chambers staff in this case, as well as any members of their immediate families; and (g) all jurors assigned to this case.

162.     Plaintiff reserves the right to modify or amend the definition of the class before the Court determines whether certification is appropriate.

163.     **Numerosity.** Fed. R. Civ. P. 23(a)(1): Plaintiff does not know the exact number of Class members because such information presently is in Defendants' control. However, a 2020 estimate by the ATA found that there were 9.9 million bowhunters, 17.6 million recreational archers, and 5.4 million competitive archers. Based on that and the nature of the trade and commerce involved, Plaintiff estimates there are, at least, millions of Class members. Accordingly, the Class is so numerous and geographically dispersed across the United States that joinder of all members is impracticable.

164.     **Common Questions Predominate**. Fed. R. Civ. P. 23(a)(2) and (b)(3): Numerous questions of law and fact are common to the Class related to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

    a.    whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for Archery Products during the Class Period;

    b.    whether such agreements constituted violations of the Sherman Act;

    c.    the identity of the alleged conspiracy's participants;

    d.    the duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e. whether Defendants and their co-conspirators fraudulently concealed their misconduct;

f. whether and to what extent Defendants' and their co-conspirators' anticompetitive scheme inflated retail prices for Archery Products above competitive levels;

g. the nature and scope of injunctive relief necessary to restore competition to the market for Archery Products; and

h. the measure of damages suffered by Plaintiff and the Class.

165. These and other questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class. Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

166. **Typicality,** Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

167. Plaintiff and other Class members were injured by the same unlawful conduct, which resulted in their paying more for Archery Products than they would have in a competitive market.

168. **Adequacy of Representation,** Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent the interests of the Class because Plaintiff purchased an Archery Product manufactured by a Manufacturer Defendant from a Retailer Defendant within the U.S. during the Class Period. Plaintiff has no material conflicts with any other members of the Class that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is adverse

to the interests of other members of the Class, and the infringement of rights and damages Plaintiff sustained are typical of those of other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation. Plaintiff intends to prosecute this action vigorously.

169. **Common Grounds for Injunctive Relief**, Fed. R. Civ. P. 23(b)(2): Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

170. **Superiority**, Fed. R. Civ. P. 23(b)(3): Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

171. This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

## X. CLAIMS FOR RELIEF

### <u>COUNT 1</u>
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) for Restraint of Trade**
**(On Behalf of Nationwide Class)**
**Against All Defendants**

172. Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2014, although further investigation and discovery may reveal an earlier date, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

174. Defendants and their co-conspirators entered into a contract, combination or conspiracy to fix, raise, stabilize, or otherwise maintain at artificially high levels the prices they charged for Archery Products, causing anticompetitive effects without sufficient procompetitive justifications.

175. Defendants and their co-conspirators executed this conspiracy to eliminate horizontal price competition for Archery Products at the retail level by agreeing to adopt, implement, and enforce MAP policies which served to fix, raise, stabilize or otherwise maintain the price of Archery Products at artificially high levels.

50

176.    This conduct is unlawful under the *per se* standard. Defendants' and their co-conspirators' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

177.    Plaintiff, and other members of the Class, have been injured, and will continue to be injured in the form of paying supracompetitive prices for Archery Products.

178.    Defendants' and their co-conspirators' anticompetitive conduct had the following effects, among others:

   a.  Competition among Defendants has been restrained or eliminated with respect to Archery Products;

   b.  The price of Archery Products has been fixed, stabilized, raised, or otherwise maintained at artificially high levels; and

   c.  Consumers of Archery Products have been deprived of the benefits of free and open competition between and among Defendants.

179.    Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants and their co-conspirators to end the ongoing violations alleged herein.

**COUNT 2**
**Information Exchange in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(On Behalf of Nationwide Class)**
**Against Manufacturer Defendants, Retailer Defendants, and Defendant ATA**

180.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

51

181.     Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2014, though further investigation and discovery may reveal an earlier date, and continuing through the present, Manufacturer Defendants, Retailer Defendants, the ATA, and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

182.     In furtherance of this scheme, Manufacturer Defendants, Retailer Defendants, the ATA, and their co-conspirators have, between and among themselves, exchanged competitively sensitive information such as prices, output, supplies, costs, and business strategies.

183.     This contract, combination, or conspiracy involving the exchange of competitively sensitive information between and among Manufacturer Defendants, Retailer Defendants, the ATA, and their co-conspirators caused anticompetitive effects without sufficient procompetitive justifications.

184.     This information exchange has been undertaken in furtherance of an agreement to restrain trade, which is unlawful *per se*. The conduct of the Manufacturer Defendants, Retailer Defendants, the ATA, and their co-conspirators is also unlawful under either a "quick look" or rule of reason analysis because the exchange is facially anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through other means which were less restrictive of competition.

185.     Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Archery Products. Absent the conspiracy to exchange competitively sensitive information, Plaintiff and class members would have paid less for Archery Products.

186.     Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants and their co-conspirators to end the ongoing violations alleged herein.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class of all others so similarly situated, respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as the Class Representative, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.     The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or rule of reason standard) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing the exchange of

competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

     E.     The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

     F.     The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated: July 17, 2025

Respectfully submitted,

*/s/ Kelly K. Iverson*
Kelly K. Iverson (PA 307175)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
(412) 322-9243
kelly@lcllp.com

Gregory S. Asciolla (*pro hac vice* forthcoming)
Alexander E. Barnett (*pro hac vice* forthcoming)
Jonathan S. Crevier (*pro hac vice* forthcoming)
Theodore J. Salem-Mackall (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001

54

New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
jcrevier@dicellolevitt.com
tsalemmackall@dicellolevitt.com

Robert N. Peirce, III (PA 76130)
D. Aaron Rihn (PA 85752)
**ROBERT PEIRCE & ASSOCIATES P.C.**
437 Grant Street, Suite 1100
Pittsburgh, Pennsylvania 15219
(844) 383-0565
robpeirce@peircelaw.com
arihn@peircelaw.com

*Counsel for Plaintiff and*
*members of the Class*