## UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE: ARCHERY PRODUCTS ANTITRUST LITIGATION** | MDL No. 3160 |

### RESPONSE OF PLAINTIFF GARY DUNKIN IN SUPPORT OF MOTION FOR TRANSFER OF RELATED ACTIONS PURSUANT TO 28 U.S.C. § 1407 WITH ALTERNATIVE VENUE REQUESTED

Plaintiff Gary T. Dunkin respectfully submits this response under 28 U.S.C. § 1407 and Rule 6.2(a) of the Rules of Procedure forp the Judicial Panel on Multidistrict Litigation to the pending Motion requesting transfer and centralization of all actions alleging Archery Products manufacturers, distributors, retailers, software companies, and trade associations engaged in anticompetitive conduct to manipulate the price of Archery Products in the United States.

Plaintiff Dunkin supports consolidation and transfer of the twelve (12) currently pending actions identified in the Motion (the "Related Actions"), but Plaintiff Dunkin proposes the alternative venue of the United States District Court for the Western District of Missouri. The Western District of Missouri is a more appropriate forum given the presence of key Defendants in the District, Missouri's connection to the litigation, its geographically central location, and the experience of available judges in handling MDL litigation, including the judge assigned to the first-filed case in that District.

BACKGROUND

The volume of sales in the Archery Products[1] market has more than doubled since 2000. *See Dunkin v. Bowtech, LLC et al.*, No. 4:25-cv-00546-BP (W.D. Mo.) (hereafter "*Dunkin* Compl."), ¶29. The Archery Products market is comprised of large manufacturers, retailers, distributors, and consumers who purchase the products. Retailers purchase these Archery Products either directly from their manufacturers, or from distributors who purchased directly from the manufacturers. *See id.* at ¶31.

Archery Products are expensive. A single bow and the necessary accessories can cost thousands of dollars. *See id.* at ¶32. Retail profit margins are about 27% on bows and 40% on other Archery Products. *See id.* To obtain these margins, Defendants adopted and enforced Minimum Advertised Pricing (hereafter "MAP") policies. *See id.* at ¶33. MAP policies were supposedly designed to help consumers browse different products and prices more efficiently online by setting the minimum price that an Archery Product may be advertised for, while giving the retailer the freedom to choose the actual sale price of these products. *Id.* at ¶37. Instead, Defendants' MAP policies effectively set both prices by ousting retailers who sold Archery Products below MAP pricing. *Id.* at ¶38.

---

[1] "Archery Products" includes but is not limited to, (1) bows (compound bows, recurve bows, longbows, and crossbows) and their components; (2) arrows and their components (shaft, fletching, and nock, but not excluding the arrowheads themselves); (3) arrowheads (or arrowpoints) which includes broadheads and field points; (4) targets (bag targets, foam targets, and 3D targets); and (5) accessories (bow cases, arrow quivers, sights, scopes, and stabilizers). *See Dunkin* Compl. at ¶1 n.1.

Before the alleged conspiracy, MAP policies were sparse in number and rarely enforced. *See id.* at ¶62. This changed when the two industry powerhouses, BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops") and Cabela's, LLC ("Cabela's"), both headquartered in Missouri, joined the Archery Trade Association's ("ATA") Board of Directors. *Id.* at ¶¶ 63-65. The resources, support, and leadership provided by Bass Pro Shops and Cabela's, in conjunction with their leadership roles in the ATA, was the catalyst needed to implement Defendants' conspiracy. *Id.* at ¶65. Their support assured the industry that if they adopted MAP policies, their competition would too. *Id.*

Plaintiffs allege that Defendants, together with the ATA (also a named Defendant), colluded to enforce MAP policies for all Archery Products manufactured and sold from 2014 to the present to raise prices and increase profit margins. *Id.* at ¶60. Defendant software companies furthered the conspiracy by providing resources to help enforce these MAP policies alongside the ATA. *See id.* at ¶¶ 101-04.

Defendants suppressed price competition by fixing a price floor to make consumers pay higher prices for Archery Products. *See id.* at ¶¶ 172-81. Defendants' conspiracy and exchange of competitively-sensitive information has had the intended anticompetitive effects, including but not limited to: (1) raising, fixing, maintaining, or stabilizing prices of Archery Products at an artificially high level; and (2) eliminating or suppressing, to a substantial degree, competition among the Defendant Manufacturers, Retailers and/or Distributors for sales of Archery Products in the United States. *See id.* at ¶177.

Each of the various cases sought to be consolidated are filed on behalf of proposed Classes of purchasers of Archery Products. Since May 30, 2025, at least twelve (12) class action suits (or Related Actions) have been filed regarding Defendants' anticompetitive conduct in the Archery Products market:

- On May 30, 2025, a Related Action was filed in the District of Utah and is currently pending before the Honorable David B. Barlow (*Santarlas v. Hoyt Archery, Inc. et al.*, No. 2:25-cv-00436 (D. Utah));

- On June 27, 2025, a Related Action was filed in the District of Minnesota and is currently pending before the Honorable Laura M. Provinzino (*Babst v. Archery Trade Ass'n, Inc. et al.*, No. 0:25-cv-02721 (D. Minn.));

- On July 7, 2025, a Related Action was filed in the District of Minnesota and is currently pending before the Honorable Laura M. Provinzinio (*Janochoski v. Hoyt Archery, Inc. et al.*, No. 0:25-cv-02788 (D. Minn.));

- On July 14, 2025, a Related Action was filed in the Middle District of Tennessee and is currently pending before the Honorable Aleta A. Trauger (*Hansen v. Archery Trade Ass'n, Inc. et al.*, No. 3:25-cv-00779 (M.D. Tenn.));

- On July 15, 2025, a Related Action was filed in the Western District of Missouri and is currently pending before the Honorable Chief Judge Beth Phillips (*Dunkin v. Bowtech, LLC et al.*, No. 4:25-cv-00546 (W.D. Mo.));

- On July 16, 2025, a Related Action was filed in the District of Minnesota and is currently pending before the Honorable Laura M. Provinzino (*Simcik v. Archery Trade Ass'n, Inc. et al.*, No. 0:25-cv-02875 (D. Minn.));

- On July 17, 2025, a Related Action was filed in the Western District of Pennsylvania and is currently pending before the Honorable Marilyn J. Horan (*Butter v. Archery Trade Ass'n, Inc. et al.*, No. 2:25-cv-01004 (W.D. Pa.));

- On July 28, 2025, a Related Action was filed in the District of Utah and is currently pending before the Honorable Jill N. Parrish (*Close v. Hoyt Archery, Inc., et al.*, No. 2:25-cv-00617 (D. Utah);

- On July 29, 2025, a Related Action was filed in the Eastern District of Pennsylvania and is currently pending before the Honorable Catherine Henry. (*Hernandez Diaz, et al. v. Bowtech, Inc., et al.*, No. 2:25-cv-04277 (E.D. Penn.));

- On July 30, 2025, a Related Action was filed in the District of Colorado and is currently pending before the Honorable Regina M. Rodriguez (*Sabatini, et al., v. Hoyt Archery, Inc., et al.*, No. 1:25-cv-02355 (D. Co.));

- On August 1, 2025, a Related Action was filed in the District of Minnesota and is currently pending before the Honorable Eric C. Tostrud (*Vale v. Hoyt Archery, Inc., et al.*, No. 0:25-cv-03110 (D. Minn.)); and

- On August 5, 2025, a Related Action was filed in the Western District of Wisconsin and is currently pending before the Honorable Magistrate Judge Anita M. Boor. (*Montpetit v. Hoyt Archery, Inc., et al.*, No. 3:25-cv-00653 (W.D. Wis.)).

The Related Actions all involve overlapping defendants and each alleges that Defendants anticompetitively conspired to raise prices within the Archery Products market by coordinating with one another through the ATA and other software networks to enforce their MAP policies in violation of federal antitrust laws. Each Related Action alleges suppression of competition related to pricing in the Archery Products Market that corroborate Plaintiff Dunkin's and the Moving Plaintiff's allegations of Defendants' anticompetitive conduct. Each Related Action seeks compensatory damages and/or injunctive relief on behalf of consumer classes in the United States from January 2014 through the present. The Related Actions are also similar in procedural posture, as all are were just recently filed and no substantive rulings have been made in any case.

ARGUMENT

*In re Archery Products Antitrust Litigation* consists of antitrust class actions on behalf of individuals and entities who purchased Archery Products. All of the Related Actions allege a conspiracy to fix, raise, maintain, and/or stabilize the price of Archery Products among a substantially similar group of Defendants in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Defendants implemented and executed their conspiracy by, *inter alia*, engaging in horizontal and vertical MAP agreements, signaling, and inter-competitor communications on private forums and at trade shows.

## I.     Consolidation and Transfer of Related Actions is Appropriate and Necessary

The Panel is authorized to consolidate and transfer civil cases pending in different judicial districts when (1) the cases involve common questions of fact, (2) consolidation and transfer will be for the convenience of the parties and witnesses, and (3) consolidation and transfer will promote the just and efficient conduct of the litigation. 28 U.S.C. § 1407(a).

### A.     Consolidation or Coordination is Appropriate Because the Related Actions Involve One or More Common Questions of Fact and Law

The Related Actions proposed for transfer and consolidation are based on the same or substantially similar operative facts and therefore "involv[e] one or more common questions of fact" as required by 28 U.S.C. § 1407(a). Common questions of fact include: (a) whether Defendants conspired to fix, raise, maintain, or stabilize the price of Archery Products in the United States; (b) whether Defendants' MAP agreements were effectively

6

minimum price agreements; (c) whether Defendants have any reasonable or justified procompetitive benefits for their behavior; (d) whether Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, sales volume, demand, strategies, or other otherwise confidential business information; (e) whether Defendants' conduct caused the price of Archery Products in the United States to be at artificially high and noncompetitive levels; (f) whether Plaintiffs were injured by Defendants' conduct; and (g) whether Plaintiffs are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

The Related Actions are appropriate for transfer because they involve substantively identical factual allegations and legal claims: each allege that Defendants conspired to fix, raise, maintain, or stabilize prices for Archery Products over the same time period in violation of the Sherman Act via the same mechanisms. *See, e.g., In re: Disposable Contact Lens Antitrust Litigation*, 109 F. Supp. 3d 1369, 1370 (J.P.M.L. 2015) (centralizing related antitrust litigations alleging minimum price policies because, among other things, the cases involved common questions of fact).

## B.    Consolidation or Coordination for Pretrial Proceedings Will Further the Convenience of Parties and Witnesses

The Related Actions will involve the same requests, as well as "overlapping, complex, and voluminous discovery" regarding Defendants' conduct. *In re OpenAI, Inc., Copyright Infringement Litig.*, 2025 WL 1037221, at *1 (J.P.M.L. Apr. 3, 2025). Consolidation will therefore conserve resources and convenience those involved by avoiding duplicative,

redundant, and costly discovery proceedings, repetitive motion practice, and inconsistent pretrial rulings. *Id.*

### C.    Consolidation or Coordination of Pretrial Proceedings Will Promote the Just and Efficient Conduct of the Related Actions

The Related Actions will likely involve the same pretrial issues. Centralization will thus promote the just and efficient resolution of this litigation because it will "eliminate duplicative discovery; prevent inconsistent rulings on pretrial matters; and conserve the resources of the parties, their counsel and the judiciary." *In re AutoBody Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1391 (J.P.M.L. 2014); *see also In re: N Sea Brent Crude Oil Futures Litig.*, 978 F. Supp. 2d 1384, 1385 (J.P.M.L. 2013) ("Centralization will avoid duplicative discovery and eliminate the possibility of inconsistent rulings on *Daubert* motions and other pretrial matters.").

### D.    There is Sufficient Numerosity to Support Transfer and Consolidation

The Related Actions currently consist of twelve (12) lawsuits that each share numerous complex questions of fact and law. This is sufficiently numerous to support consolidation and transfer. *See, e.g., In re: Pork Antitrust Litig.*, 544 F. Supp. 3d 1379 (J.P.M.L. 2021) (granting transfer and consolidation of two cases for consolidation or coordination of pretrial proceedings).

## II.    The Related Actions Should be Transferred to the Western District of Missouri

Transfer and consolidation before the Western District of Missouri is appropriate because the forum (A) is where both of the key defendants are located; (B) will minimize

costs and inconvenience; (C) has the most suitable judge(s) for this litigation; and (D) has special ties to the facts of the litigation. *See* Federal Judicial Center, Manual for Complex Litigation, § 20.131 (4th Ed. 2004).

**A.    The Western District of Missouri Will Likely Emerge as a Dominant Site of Common Facts and Witnesses**

All Related Cases allege that Bass Pro Shops and Cabela's, two of the largest Defendants named by each Plaintiff, were the leaders that set the conspiracy in motion. Bass Pro Shops and Cabela's are both headquartered in the Western District of Missouri. Thus, a significant portion of documents and depositions will likely be found and taken in or near the Western District of Missouri. *In re Hydrogen Peroxide Antitrust Litig.*, 374 F. Supp. 2d 1345, 1346 (J.P.M.L. 2005) (selecting district in part due to "the presence of two of the largest domestic producers of hydrogen peroxide—both of which are named defendants—within blocks of the federal courthouse"); *see also In re UICI "Ass'n Group" Ins. Litig.*, 305 F. Supp. 2d 1360, 1362 (J.P.M.L. 2004) ("[T]he location of the moving defendants' headquarters within the Northern District of Texas implies that relevant witnesses and documents are likely to be found there.").

Defendant Rogers Sporting Goods Holdings, Inc. is also located in Missouri, with its principal place of business only 15.6 miles from the Western District of Missouri's Kansas

City courthouse.[2] Other prominent defendants, including for example the ATA, are located in the Midwest. In fact, the ATA recently (in 2024) held its annual trade show in Missouri.[3] Moreover, ATA's Board of Directors and Retail Councils included representatives of Bass Pro Shops and Cabela's throughout the period. Thus, documents and witnesses are likely to be found in the Western District of Missouri.

This, in conjunction with Bass Pro Shop's and Cabela's headquarters in Missouri, is sufficient grounds for centralization in the Western District of Missouri. *In re Chocolate Confectionary Antitrust Litig.*, 542 F. Supp. 2d 1376, 1377 (J.P.M.L. 2008) (selecting district because one defendant's headquarters was located there and "several of the defendants maintain a presence in or near that district").

**B.    Transfer to the Western District of Missouri Will Minimize Costs and Inconvenience**

All Related Cases allege a nationwide conspiracy, and the parties are geographically diverse.[4] This Court has previously recognized that the Western District of Missouri is an appropriate transferee district in similar circumstances because it "presents a

---

[2] Google Maps, (last visited Aug. 6, 2025) (Google Maps directions from Rogers Sporting Goods to the Western District of Missouri, Kansas City courthouse), https://maps.app.goo.gl/A91mcR83Xo63Yk1aA.

[3] *The 2024 ATA Show Heads to St. Louis for the First Time*, Archery Trade Ass'n (last visited, Aug. 6, 2025), https://archerytrade.org/the-2024-ata-show-heads-to-st-louis-for-the-first-time-in-show-history/.

[4] Defendants are scattered throughout the United States, including in Arizona, California, Michigan, Missouri, Minnesota, Nebraska, Nevada, Oregon, Utah, and Wisconsin.

geographically central and accessible venue for this nationwide litigation." *In re T-Mobile Customer Data Security Breach Litig.*, 576 F. Supp. 3d 1373, 1375 (J.P.M.L. 2021). Indeed, Kansas City's recently renovated international airport is only a 20-minute drive from the Western District of Missouri's Kansas City division courthouse.[5] Moreover, of the jurisdictions where Related Actions have been filed, the Western District of Missouri is effectively tied for the fastest at 7.0 months.[6] Missouri also has the fourth lowest cost of living in the United States, which significantly lowers travel prices, accommodations, and other litigation costs for all parties involved.[7]

## C.    Skill, Expertise, and Current Caseload of Available Judges

The skill, expertise, and current caseload of the available judges also weighs in favor of selecting the Western District of Missouri. Hon. Chief Judge Mary E. Phillips, the judge currently presiding over Plaintiff Dunkin's action, has been a federal judge for over 20 years and the Chief Judge for the past six years. Chief Judge Phillips just recently wrapped up an MDL previously assigned to her and thus has capacity. *In re Ahern Rentals,*

---

[5] Google Maps, (last visited Aug. 5, 2025) (Google Maps directions from Kansas City International Airport to the Western District of Missouri, Kansas City courthouse), https://maps.app.goo.gl/UkkWsu4qCHoEC5YV7.

[6] United States District Courts – National Judicial Caseload Profile, (March 31, 2025), https://www.uscourts.gov/sites/default/files/document/fcms_na_distprofile0331.2025.pdf.

[7] *Cost of Living Data Series*, Missouri Econ. Research & Info. Ctr., (last visited Aug. 6, 2025), https://meric.mo.gov/data/cost-living-data-series.

*Inc., Trade Secret Litigation*, MDL 2945 (W.D. Mo.) (filed May 6, 2020; transferred August 7, 2020; closed April 10, 2025); *see also In re Folgers Coffee Mktg. & Sales Practices Litig.*, MDL 2984 (W.D. Mo.) (currently stayed pending an Eighth Circuit appeal). This Court has previously recognized Chief Judge Phillips's ability to manage large litigations like this one. *In re Folgers Coffee Mktg. & Sales Practices Litig.*, 532 F. Supp. 3d 1416, 1417 (J.P.M.L. 2021) ("The Honorable Beth Phillips is an experienced jurist with the ability and willingness to manage this litigation efficiently. We are confident that she will steer this litigation on a prudent course."); *In re Ahern Rentals, Inc., Trade Secret Litig.*, 481 F. Supp. 3d 1355, 1357 (J.P.M.L. 2020) (same).[8]

---

[8] Should Chief Judge Phillips not be interested in this MDL, the Western District of Missouri has an array of experienced MDL jurists that are more than capable of fairly and efficiently managing this litigation. The Hon. Stephen R. Bough has experience handling MDLs generally and complex antitrust litigation specifically. *See In re: Smitty's CAM2 303 Tractor Hydraulic Fluid Mktg., Sales Practices & Products Liab. Litig.*, No. 4:20-md-02936 (W.D. Mo.) (resolved April 2, 2025); *Burnett, et al. v. Nat'l Assoc. of Realtors, et al.*, No. 4:19-cv-00332 (W.D. Mo.); *Gibson, et al. v. Nat'l Assoc. of Realtors, et al.*, No. 4:23-cv-00788 (W.D. Mo.). *Burnett* resulted in a jury trial, and *Gibson* was destined for consolidation until nationwide settlements were reached. *See In re Real Est. Comm'n Antitrust Litig.*, 732 F. Supp. 3d 1377, 1379-80 (J.P.M.L. 2024).

The Hon. Brian C. Wimes would also be an excellent candidate, with over two decades of experience as a federal judge and complex MDL experience. *In re: Arch Ins. Co. Ski Pass Ins. Litig.*, 4:20-md-02955 (W.D. Mo.); *In re: T-Mobile Customer Data Sec. Breach Litig.*, No. 4:21-md-03019 (W.D. Mo.) This Court has previously recognized the Hon. Wimes for "ably steer[ing]" other MDLs. *In re T-Mobile 2022 Customer Data Sec. Breach Litig.*, 6766 F. Supp. 3d 1366, 1367 (J.P.M.L. 2023). While the Hon. Wimes is currently presiding over *In re: T-Mobile Customer Data Sec. Breach Litig.*, that litigation is currently stayed pending appeal to the Eighth Circuit.

D.    **Missouri has Significant Ties to Archery**

In addition to Missouri's central location and being home to the two most prominent Defendants, Bass Pro Shops and Cabela's, Missouri also has significant ties to archery in general. *In re Chrysler-Dodge-Jeep EcoDiesel Mkt. Sales Practices & Prod. Liab. Litig.*, 273 F. Supp. 3d 1377 (J.P.M.L. 2017) (selecting Northern District of California because of California's "strong factual connection to this litigation"). Indeed, archery is Missouri's official state sport, RSMo. § 10.245, it is home to the Archery Hall of Fame, and Kansas City is where the compound bow was first invented.[9] Further, Missouri is a member of the National Archery in Sports Program, bringing archery to schools state-wide.

Since 2008, the Missouri National Archery in the Schools Program ("MoNASP") has been adopted by more than 700 participating schools and has affected over 200,000 Missouri students. The annual MoNASP State Tournament has since grown to be the second largest state tournament in the nation, with more than 3,300 competitors and 14,500 spectators attending in 2019 alone.[10] Currently, Missouri is home to all number 1 ranked males in the championship/world and national tournament events within the

---

[9] *State Symbols of Missouri*, Missouri Sec'y of State, (last visited Aug. 6, 2025), https://www.sos.mo.gov/CMSImages/Publications/StateSymbols.pdf.

[10] *What Archery Means to Me*, Missouri Conservation Heritage Found., (last visited Aug. 6, 2025), https://mochf.org/what-archery-means-to-me/.

high school division.[11] A survey from 2015 by defendant ATA highlighted Missouri as a hub for growth for the sport of archery.[12] In fact, the ATA recognized Missouri's long-standing and significant history, association, and contributions to archery.[13]

### E.    Informal Conferrals with Other Parties

Counsel for Plaintiff Dunkin has engaged in informal communications with counsel in other Related Actions, including counsel for Plaintiff Santarlas, in a good faith attempt to consolidate the proceedings without intervention from this Court or otherwise to streamline the decision by this Court. Thus far, the parties have been unable to agree on a venue for consolidation or the voluntary transfer of actions.

### CONCLUSION

For the reasons stated herein, the Panel should centralize the Related Actions in the Western District of Missouri.

---

[11] *Individual Archer Rankings*, Nat'l Archery in Sch. Program, (last visited Aug. 6, 2025), https://nasptournaments.org/Rank/IndRankings.aspx.

[12] Derek Shore, *Archery Continues to Grow Nationwide*, The Standard, Missouri State University (Mar. 18, 2019), https://www.the-standard.org/archery-continues-to-grow-nationwide/article_f2476aa0-49f4-11e9-822d-672df26e162f.html.

[13] *ATA Joins Missouri in Recognizing Archery as the Official State Sport*, Archery Trade Association, (last visited Aug. 6, 2025), https://archerytrade.org/ata-joins-missouri-in-recognizing-archery-as-the-official-state-sport/.

Dated: August 6, 2025

Respectfully submitted,

/s/ Ashlea G. Schwarz
Ashlea G. Schwarz
David W. Bodenheimer
Megan M. Duffield
PAUL LLP
600 Broadway Boulevard, Suite 600
Kansas City, Missouri 64105
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Ashlea@PaulLLP.com
David@PaulLLP.com
Megan@PaulLLP.com

*Counsel for Plaintiff Gary T. Dunkin*
Case No. 4:25-cv-00546 (W.D. Mo.)